[Cite as *State v. Burris*, 2022-Ohio-1481.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| RALPH E. BURRIS, JR., | : | Case No. 21CA000021 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Guernsey County
                                  Court of Common Pleas, Case No.
                                  20CR000225


JUDGMENT:                         Affirmed


DATE OF JUDGMENT:                 May 3, 2022


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

Guernsey County Prosecutor's Office       Office of the Ohio Public Defender

JASON R. FARLEY                           VICTORIA BADER
Assistant Prosecuting Attorney            Assistant State Public Defender
627 Wheeling Avenue                       250 East Broad St., Suite 1400
Cambridge, Ohio 43725                     Columbus, Ohio 43215

*Baldwin, J.*

**{¶1}** Defendant-appellant Ralph Burris, Jr. appeals his conviction and sentence from the Guernsey County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND CASE

**{¶2}** On October 22, 2020, the Guernsey County Grand Jury indicted appellant on one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(c), a felony of the second degree. At his arraignment, appellant entered a plea of not guilty to the charge.

**{¶3}** Subsequently, a jury trial commenced on July 13, 2021. The following testimony was adduced at trial.

**{¶4}** On September 7, 2020, appellant was arrested on an outstanding warrant unrelated to this case after a traffic stop. Nothing was found during a post-arrest search of appellant's vehicle and appellant's mother, Dreama Burris, took possession of the vehicle.

**{¶5}** Corporal Lawrence Jeffrey, who was employed by the Guernsey County Sheriff's Office inside the jail, testified that he monitored appellant's phone calls from the jail, which were recorded, and that he contacted Sergeant Rogers after reviewing the calls because "[s]ome of the stuff that I heard on the phone calls I thought maybe they might need to know about." Trial Transcript at 225. Detective Brian Carpenter of the Guernsey County Sheriff's Office listened to the calls between appellant and his mother. After reviewing the phone calls, Detective Carpenter applied for a search warrant for Dreama Burris's residence. Appellant also resided at the same address according to appellant's driving record.

**{¶6}** Detective Carpenter testified that he and Sergeant Rogers made contact with Dreama Burris on September 21, 2020 and advised her that they believed that she had information or knowledge concerning some illegal substances at her residence. While she initially denied the accusations, she then became cooperative. She led the two officers to her bedroom and retrieved a brown cardboard box from her closet. The box contained a black lockbox wrapped with plastic bags. The lockbox contained multiple bags of a substance later determined to be methamphetamines. The lockbox also contained a "small piece of paper with nine names written to the left in a vertical fashion with numbers to the right of each name going down in a vertical fashion." Trial Transcript at 252. A pack of rolling papers and syringes also were located. Detective Carpenter testified that appellant, during a phone call from the jail, had indicated that the lockbox was his.

**{¶7}** Detective Carpenter testified that he listened to all of appellant's calls from the jail. He testified that during a call on September 8, 2020, appellant asked his mother "if she got everything out of his car making sure that it was put up and nothing thrown away." Trial Transcript at 263. Appellant explained to his mother that there was a lot of money in there and told her not to sell his clothes. Detective Carpenter testified that appellant, during the phone call, indicated that they needed to be careful about what they said over the phone stating "I know that's why I'm using the key words." Trial Transcript at 266. Appellant told his mother during a September 9, 2020 call that when she got his lockbox out of his bedroom, there was "stuff" in there. Trial Transcript at 268. Appellant referred to "ice cream" during a September 10, 2020 call, which, the Detective testified, meant crystal methamphetamine in drug lingo. Trial Transcript at 268-269. Appellant told

his mother that there was $4,000.00 worth and that he was glad that they did not tow his car. Appellant further advised his mother that ice cream melts and that she should not keep it anywhere hot.

{¶8} Detective Carpenter testified that during a September 11, 2020 call, appellant asked his mother if "that shit locked up?" and told her to keep it locked up. Trial Transcript at 273. During a September 15, 2020 call, appellant stated "everything, my stuff all locked up, my clothes …. before you get my clothes out of my car, wasn't there already clothes in my box". Trial Transcript at 273. Appellant also told his mother that he was not actually talking about clothes and made a statement about getting rid of his jeans. During a conversation with his mother on September 16, 2020, appellant talked about a man named Mervin and indicated that he believed that Mervin owed him $90.00. This, Detective Carpenter testified, indicated to him that the list that was found in appellant's wallet which was inside of appellant's mother's purse was of people that owed appellant money. He testified that there were other conversations during which appellant said that the people on the list owed him money that he had loaned them from his unemployment check.

{¶9} The Detective further testified that, on September 19, 2020, appellant spoke with his father and told him that he had called his mother to come and get the car "so it wouldn't be towed because he had a QP in there, …" Trial Transcript at 278. Detective Carpenter testified that "QP" was common nomenclature in narcotics fields for a quarter pound. He testified that they did not find a quarter pound in Dreama Burris's house. The following is an excerpt from Detective Carpenter's testimony:

{¶10} Q.   Okay. Did he indicate anything else?

{¶11} A.   He did. He went on to explain that his mother got the car before they searched it and she took it back to the house, … so I got a QP of jeans sitting at Mom's now."

{¶12} He continued to state that when he gets out of jail, he'll get rid of the jeans he has left, take the money to put a down payment on a place and continued to say, quote, if they would have found them jeans, he would have been hit too, and he lastly added, they were size fours, they were large.

{¶13} Q. Size four jeans were large?

{¶14} A.  According to Mr. Burris, Jr., yes.

{¶15} Q. And, again, he's not actually talking about clothes?

{¶16} A.  No, ma'am.

{¶17} Q. What do you think he was talking about?

{¶18} A.  Methamphetamines.

{¶19} Q. Is that why you applied for the search warrant?

{¶20} A.  It was.

{¶21} Q. Is that why you went to Dreama Burris's house?

{¶22} A.  It was.

{¶23} Q. And that's where you found the meth?

{¶24} A.  It was.

{¶25} Q. in the lockbox he's talking about?

{¶26} A.  Yes, ma'am.

{¶27} Trial Transcript at 279-280.

**{¶28}** Approximately 50 grams of methamphetamines was seized. Both appellant and his mother were charged with aggravated possession of the drugs recovered from Dreama Burris's bedroom closet. Dreama Burris pleaded guilty to possession between September 8, 2020 and September 21, 2021. Following his jury trial, appellant was found guilty of one count of aggravated possession of drugs. Pursuant to a Judgment Entry filed on July 28, 2021, appellant was sentenced to a minimum term of six (6) years and a maximum term of nine (9) years in prison.  Because appellant was found to be an indigent person, no discretionary fine was imposed and the mandatory fine was waived. The trial court ordered appellant to pay court costs.

**{¶29}** Appellant now appeals, raising the following assignments of error on appeal:

**{¶30}** "I. THE TRIAL COURT ERRED WHEN IT SENTENCED MR. BURRIS TO AN INDEFINITE SENTENCE UNDER THE UNCONSTITUTIONAL REAGAN TOKES LAW."

**{¶31}** "II. MR. BURRIS RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN TRIAL COUNSEL FAILED TO MOVE FOR WAIVER OF COURT COSTS AT SENTENCING."

**{¶32}** "III. MR. BURRIS' CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I

**{¶33}** Appellant, in his first assignment of error, argues that his sentence is contrary to law because the Reagan Tokes Act violates the Ohio and United States

Constitutions by violating a person's constitutional right to trial by jury, separation of powers and due process. We disagree.

**{¶34}** As an initial matter, we note that the Ohio Supreme Court recently held that the constitutionality of the Reagan Tokes Act was ripe for review on the defendant's direct appeal of his or her conviction and prison sentence. See *State v. Maddox,* --N.E.3d--, 2022-Ohio-764.

### The Reagan Tokes Law

**{¶35}** R.C. 2967.271, which is a part of the "Reagan Tokes Law" allows the Ohio Department of Rehabilitation and Correction ("DRC") to administratively extend an incarcerated person's prison term beyond his or her minimum prison term or presumptive earned early-release date, but not beyond his or her maximum prison term. The Reagan Tokes Law (S.B. 201) was enacted in 2018 and became effective on March 22, 2019. The Reagan Tokes Law, "significantly altered the sentencing structure for many of Ohio's most serious felonies' by implementing an indefinite sentencing system for those non-life felonies of the first and second degree, committed on or after the effective date." *State v. Polley*, 6th Dist. Ottawa No. OT-19-039, 2020-Ohio-3213, ¶ 5, fn. 1.

**{¶36}** As with any statute enacted by the General Assembly, the Reagan Tokes Law is entitled to a "strong presumption of constitutionality." *State v. Romage*, 138 Ohio St.3d 390, 2014-Ohio-783, 7 N.E.3d 1156, ¶ 7. Thus, "if at all possible, statutes must be construed in conformity with the Ohio and the United States Constitutions." *State v. Collier,* 62 Ohio St.3d 267, 269, 581 N.E.2d 552 (1991). A party challenging the constitutionality of a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt. *State v. Bloomer*, 122 Ohio St.3d 200, 2009-Ohio-2462, 909 N.E.2d

1254, ¶ 41, *citing State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, ¶ 12.

**{¶37}** The power to define criminal offenses and prescribe punishment is vested in the legislative branch of government and courts may only impose sentences as provided by statute. *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

**{¶38}** In the case at bar, the legislature has authorized as a sentence for a felony of the second degree:

**{¶39}** (2)(a) For a felony of the second degree committed on or after the effective date of this amendment, the prison term shall be an indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and a maximum term that is determined pursuant to section 2929.144 of the Revised Code, except that if the section that criminalizes the conduct constituting the felony specifies a different minimum term or penalty for the offense, the specific language of that section shall control in determining the minimum term or otherwise sentencing the offender but the minimum term or sentence imposed under that specific language shall be considered for purposes of the Revised Code as if it had been imposed under this division.

**{¶40}** Ohio Rev. Code Ann. 2929.14 (A)(2)(a).

**{¶41}** Indefinite sentences are not new to Ohio. What is different from prior law regarding indefinite sentences is that the Reagan Tokes Law has created a presumptive release date.

**{¶42}** The Reagan Tokes Law requires that a court imposing a prison term under R.C. 2929.14(A)(1)(a) or (2)(a) for a first or second degree felony committed on or after March 22, 2019, impose a minimum prison term under that provision and a maximum prison term determined under R.C. 2929.144(B); R.C. 2929.144(C). Further, under the Reagan Tokes Law, there is a presumption that the offender "*shall be released* from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C. 2967.271(B) (emphasis added). A presumptive earned early release date is a date determined under procedures described in R.C. 2967.271(F), which allow the sentencing court to reduce the minimum prison term under certain circumstances. R.C. 2967.271(A)(2). The DRC may rebut the presumption if it determines at a hearing that one or more statutorily numerated factors apply. R.C. 2967.271(C). If DRC rebuts the presumption, it may maintain the offender's incarceration after the expiration of the minimum prison term or presumptive earned early release date for a reasonable period of time, determined and specified by DRC that "shall not exceed the offender's maximum prison term." R.C. 2967.271(D)(1).

**{¶43}** Under the Reagan Tokes Law, the judge imposes both a minimum and a maximum sentence. Judicial fact-finding is not required. In Ohio, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124 paragraphs 1 and 11. The Department of Rehabilitation and Correction

("DRC") is not permitted to extend a sentence imposed by the trial court beyond the maximum sentence imposed by the trial court.

**An incarcerated individual does not have a constitutional right to parole or release before serving his entire sentence.**

{¶44}  An inmate has no constitutional right to parole release before the expiration of his sentence. *Greenholtz v. Inmates of the Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). The Ohio Adult Parole Authority has "wide-ranging discretion in parole matters." *Layne v. Ohio Adult Parole Auth.*, 97 Ohio St.3d 456, 2002-Ohio-6719, 780 N.E.2d 548, ¶ 28.

{¶45} The Supreme Court has made it clear that a mere unilateral hope or expectation of release on parole is not enough to constitute a protected liberty interest; the prisoner "must, instead, have a legitimate claim of *entitlement* to it." *Greenholtz,* 422 U.S. at 7, 99 S.Ct. at 2104 (*quoting Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)) (emphasis supplied). Moreover, only state law can create this "legitimate claim of entitlement"; the federal constitution protects such claims, but does not create them. "[T]here is no constitutional or inherent right of a convicted person to be conditionally released [i.e., released on parole] before the expiration of a valid sentence." *Greenholtz,* 442 U.S. at 7, 99 S.Ct. at 2104. *Accord, Inmates of Orient Correctional Institute v. Ohio State Parole Board,* 929 F.2d 233, 235 (6th Cir. 1991).

{¶46} However, if state law entitles an inmate to be released on parole that entitlement is a liberty interest that is not to be taken away without due process. *See Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), where the Supreme Court so held in the context of a

statute providing that the Nebraska parole board "shall" release parole-eligible inmates unless one of several factors specified in the statute should be found to exist.

**{¶47}** As relevant here, R.C. 2967.271(B) states:

**{¶48}** (B) When an offender is sentenced to a non-life felony indefinite prison term, there shall be a presumption that *the person shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier.* (Emphasis added).

**{¶49}** Also relevant is R.C. 2967.271(C), which states:

**{¶50}** (C) The presumption established under division (B) of this section is a rebuttable presumption that the department of rehabilitation and correction may rebut as provided in this division. Unless the department rebuts the presumption, the offender shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier. The department may rebut the presumption only if the department determines, at a hearing, that one or more of the following applies:

**{¶51}** (1) Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:

**{¶52}** (a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated.

**{¶53}** (b) The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender continues to pose a threat to society.

**{¶54}** (2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

**{¶55}** (3) At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

**{¶56}** The legislature by choosing the language "there shall be a presumption that the person *shall be released*" and "Unless the department rebuts the presumption, the offender *shall be released*," within the Reagan Tokes Law has arguably created enforceable liberty interests in parole. *Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). *See, also, Inmates of Orient Correctional Institute v. Ohio State Adult Parole Authority,* 929 F.2d 233, 236-237 (6th Cir. 1991) ("Although the power to deny parole is purely discretionary as far as Ohio's statutes are concerned, the state's administrative regulations must also be considered. If Ohio's regulations created an explicit presumption of entitlement to release on parole—as Tennessee's regulations formerly did, *see Mayes v. Trammell*, 751 F.2d 175, 178 (6th Cir. 1984)—or if the Ohio regulations otherwise used "'mandatory language' in connection with 'specific substantive predicates' " for release on parole, *see Beard v. Livesay*, 798 F.2d 874, 877 (6th Cir. 1986) (quoting *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)), the regulations alone could create a protected liberty interest."). *Cf. State, ex rel. Bailey v. Ohio Parole Board,* 152 Ohio St.3d 426, 2017-Ohio-9202, 97 N.E.3d 433, ¶ 10

("The Revised Code creates an inherent expectation 'that a criminal offender will receive meaningful consideration for parole.' " (*Citing Layne v. Ohio Adult Parole Auth.*, 97 Ohio St.3d 456, 2002-Ohio-6719, 780 N.E.2d 548, ¶ 27).

**{¶57}** "As for the Due Process Clause, standard analysis under that provision proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)." *Swarthout v. Cooke,* 562 U.S. 216, 219, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011). Having created an enforceable liberty interest in parole by the express terms of the Reagan Tokes Act, the question now becomes what process is due in the prison setting.

### Due Process in the Prison Setting

**{¶58}** When a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication—and courts will review the application of those constitutionally required procedures. *Swarthout v. Cooke,* 562 U.S. 216, 220, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011).

**{¶59}** In the context of parole, the United States Supreme Court has held that the procedures required are minimal. In *Greenholtz*, the Court found that a prisoner subject to a parole statute received adequate process when he was allowed an opportunity to be heard and was provided a statement of the reasons why parole was denied. Id. at 16, 99 S.Ct. 2100. "The Constitution," we held, "does not require more." *Swarthout v. Cooke,* 562 U.S. 216, 220, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011).

{¶60} {¶50} In *Woods v. Telb*, the Ohio Supreme Court made the following observation concerning Ohio law:

Under the [pre-SB2] system of parole, a sentencing judge, imposing an indefinite sentence with the possibility of parole, had limited power or authority to control the minimum time to be served before the offender's release on parole; the judge could control the maximum length of the prison sentence, but the judge had no power over when parole might be granted in between those parameters. The judge had no power to control the conditions of parole or the length of the parole supervision.

\*\*\*

But, we observe that for as long as parole has existed in Ohio, the executive branch (the APA and its predecessors) has had absolute discretion over that portion of an offender's sentence. *See State ex rel. Atty. Gen. v. Peters* (1885), 43 Ohio St. 629, 4 N.E. 81.

\*

*Woods v. Telb,* 89 Ohio St.3d at 511-512, 2000-Ohio-171, 733 N.E.2d 1103.

{¶61} Although entitled to the protection under the Due Process Clause, "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (citations omitted). In *Wolff,* the United States Supreme Court observed.

In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the

full range of procedures suggested by *Morrissey* [*v. Brewer*, 408 U.S. 471,

92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)] for alleged parole violators is the very

different stake the State has in the structure and content of the prison

disciplinary hearing. That the revocation of parole be justified and based on

an accurate assessment of the facts is a critical matter to the State as well

as the parolee; but the procedures by which it is determined whether the

conditions of parole have been breached do not themselves threaten other

important state interests, parole officers, the police, or witnesses—at least

no more so than in the case of the ordinary criminal trial. Prison disciplinary

proceedings, on the other hand, take place in a closed, tightly controlled

environment peopled by those who have chosen to violate the criminal law

and who have been lawfully incarcerated for doing so. Some are first

offenders, but many are recidivists who have repeatedly employed illegal

and often very violent means to attain their ends. They may have little

regard for the safety of others or their property or for the rules designed to

provide an orderly and reasonably safe prison life. Although there are very

many varieties of prisons with different degrees of security, we must realize

that in many of them the inmates are closely supervised and their activities

controlled around the clock. Guards and inmates co-exist in direct and

intimate contact. Tension between them is unremitting. Frustration,

resentment, and despair are commonplace. Relationships among the

inmates are varied and complex and perhaps subject to the unwritten code

that exhorts inmates not to inform on a fellow prisoner.

418 U.S. 539, 561-562, 94 S.Ct. 2963, 41 L.Ed.2d 935.

**{¶62}** Indeed, it has been noted, "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)].* As the *Martinez* Court acknowledged, "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." Id., at 404–405, 94 S.Ct. at 1807. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id at 405.   Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities. See Id., at 405, 94 S.Ct. at 1807."

**{¶63}** *Turner v. Safley,* 482 U.S. 78, 84-85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

**{¶64}** "Viewed in this light it is immediately apparent that one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a state prison." *Wolff v. McDonnell,* 418 U.S. at 560, 94 S.Ct. 2963, 41 L.Ed.2d 935.

**{¶65}** The Courts have found therefore, that the following procedures should be accorded to prisoners facing prison disciplinary proceedings: 1). a prisoner is entitled to

a review unaffected by "arbitrary" decision-making. *Wolff,* 418 U.S. at 557-558, 94 S.Ct. 2963; (*See,* Ohio Adm. Code 5120-9-08). 2). Advance written notice of the claimed violation. *Wolff,* 418 U.S. at 563, 94 S.Ct. 2963. (*See,* Ohio Adm. Code 5120:1-8-12). 3). A written statement of the fact finders as to the evidence relied upon and the reasons for the disciplinary action taken. *Wolff,* 418 U.S. at 563, 94 S.Ct. 2963. (*See,* Ohio Adm. Code 5120-9-08(M); Ohio Adm. Code 5120:1-11(G)(1)). 4). Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. *Wolff,* 418 U.S. at 566, 94 S.Ct. 2963. (*See,* Ohio Adm. Code 5120-9-08(E) (3); Ohio Adm. Code 5120-9-08(F)). 5). "Where an illiterate inmate is involved, however, or whether the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Wolff,* 418 U.S. at 570, 94 S.Ct. 2963. (*See,* Ohio Adm. Code 5120-9-07(H)(1)).

{¶66} In the case at bar, in order to rebut the presumptive release date, the DRC must conduct a hearing and determine whether any of the following factors are applicable:

{¶67} (1) Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:

{¶68} (a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution,

compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated.

**{¶69}** (b)  The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender continues to pose a threat to society.

**{¶70}** (2)  Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

**{¶71}** (3)  At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

**{¶72}**  R.C. 2967.271 (C)(1), (2) and (3).

**{¶73}**  "Although the power to deny parole is purely discretionary as far as Ohio's statutes are concerned, the state's administrative regulations must also be considered." *Inmates of Orient Correctional Institute v. Ohio State Adult Parole Authority,* 929 F.2d 233, 236 (6th Cir. 1991). The DRC is required to provide notice of the hearing. R.C. 2967.271(E). Ohio Adm. Code 5120-9-06 sets forth the inmate rules of conduct. Ohio Adm. Code 5120-9-08 sets forth the disciplinary procedures for violations of inmate rules of conduct before the rules infraction board. Ohio Adm. Code 5120-9-10 sets forth the procedures for when and under what circumstances an inmate may be placed in and/or transferred to a restrictive housing assignment. Ohio Adm. Code 5120: 1-1-11 sets forth the procedure of release consideration hearings. Thus, an inmate is given notice in

advance of the behavior that can contribute or result in an extended sentence and under what circumstance the inmate can be placed or transferred to a restrictive housing assignment.

**{¶74}** Each procedure employed provides at the least for notice and the opportunity to be heard. Under the Reagan Tokes Law, an inmate is afforded notice and a hearing by R.C. 2967.271(E), which states:

**{¶75}** The [DRC] shall provide notices of hearings to be conducted under division (C) or (D) of this section in the same manner, and to the same persons, as specified in section 2967.12 and Chapter 2930 of the Revised Code with respect to hearings to be conducted regarding the possible release on parole of an inmate.

**{¶76}** *See, State v. Guyton,* 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 11; *State v. Leet,* 2nd Dist. Montgomery No. 28670, 2020-Ohio-4592, ¶19 ("Reagan Tokes does not facially violate a defendant's right to procedural due process.")

**{¶77}** We find, therefore, that Reagan Tokes does not violate appellant's right to due process.

**Separation of Powers is not Violated**

**{¶78}** Nor can it be argued that because the DRC can increase a sentence beyond the minimum given by the trial judge, the Reagan Tokes Law usurps judicial authority. As already noted, the DRC may not increase the sentence beyond the maximum sentence imposed by the trial court. The Ohio Supreme Court has made it clear that, when the power to sanction is delegated to the executive branch, a separation-of-powers problem is avoided if the sanction is originally imposed by a court and included in its sentence. *See Hernandez v. Kelly,* 108 Ohio St.3d 395, 2006-Ohio-126, 844 N.E.2d 301, ¶ 18-20,

*citing State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 19. Such is the case under the scheme established by the Reagan Tokes Law. *State v. Ferguson,* 2nd Dist. Montgomery No. 28644, 2020-Ohio-4153, ¶23. The statute does not permit the DRC to act " 'as judge, prosecutor and jury,' for an action that could be prosecuted as a felony in a court of law." *Woods v. Telb,* 89 Ohio St.3d at 512, 733 N.E.2d 1103, *quoting State, ex rel. Bray v. Russell,* 89 Ohio St.3d 132, 135, 729 N.E.2d 359 (2000). It should be noted that Bray was charged with and convicted of drug possession and sentenced to an eight-month prison term. While in prison, Bray allegedly assaulted a prison guard in violation of R.C. 2903.13. Pursuant to R.C. 2967.11(B), the Ohio Parole Board imposed a ninety-day bad-time penalty to be added to Bray's original term. Bray's original sentence of eight months for drug possession expired on June 5, 1998, at which time his additional ninety-day penalty began. On June 12, 1998, Bray filed a writ of habeas corpus in the Court of Appeals for Warren County, claiming that Warden Harry Russell was unlawfully restraining him. 89 Ohio St.3d 132, 133, 729 N.E.2d 359. Thus, the Parole Board extended Brey's sentence beyond the maximum sentence the trial court had impose. Appellant points to nothing within the Reagan Tokes Law that would permit the DRC to extend his sentence beyond the maximum time set by the trial judge.

**{¶79}** Furthermore, as we have noted, under the Reagan Tokes Law an inmate is afforded the due process rights accorded to one who is incarcerated before any increase can occur. Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. For as long as parole has existed in Ohio, the executive branch (the APA and its predecessors) has had

absolute discretion over when parole will be granted. *Woods v. Telb,* 89 Ohio St.3d at 511-512, 733 N.E.2d 1103.

**{¶80}** The Reagan Tokes Law does not allow the DRC to lengthen a defendant's sentence beyond the maximum sentence imposed by the trial court. The Law does not give the DRC unfettered discretion to require an offender to serve more than the minimum term. The statutes afford an offender notice and an opportunity to be heard before a more than the minimum may be required. The Reagan Tokes Law provides a prisoner with the appropriate due process rights accorded to prisoners.

**{¶81}** Although entitled to the protection under the Due Process Clause, prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. For as long as parole has existed in Ohio, the executive branch (the APA and its predecessors) has had absolute discretion over when parole will be granted. *Woods v. Telb,* 89 Ohio St.3d at 511-512, 733 N.E.2d 1103.

**{¶82}** Based on the forgoing, we find that the Reagan Tokes Law does not violate the separation of powers doctrine.

### Right to Jury Trial not Violated

**{¶83}** Appellant also argues that Reagan Tokes violates his right to have a jury determine any increase in punishment beyond the minimum sentence, citing *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Appellant notes that the DRC can unilaterally find facts concerning sufficiently bad behavior to rebut the presumption of release and extend his sentence.

{¶84} In *Apprendi,* a jury convicted the defendant of a gun crime that carried a maximum prison sentence of 10 years. But then a judge sought to impose a longer sentence pursuant to a statute that authorized him to do so if he found, by a preponderance of the evidence, that the defendant had committed the crime with racial bias. *Apprendi* held this scheme unconstitutional. "[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum," the Court explained, "must be submitted to a jury, and proved beyond a reasonable doubt" or admitted by the defendant. 530 U. S. at 490, 120 S.Ct. 2348. Nor may a State evade this traditional restraint on the judicial power by simply calling the process of finding new facts and imposing a new punishment a judicial "sentencing enhancement." Id., at 495, 120 S.Ct. 2348. "[T]he relevant inquiry is one not of form, but of effect—does the required [judicial] finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Id., at 494, 120 S.Ct. 2348.

{¶85} In *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), the United States Supreme Court addressed a case concerning mandatory minimum sentences and the Sixth Amendment. In *Alleyne*, the jury relied on the testimony of the victim of an armed robbery that one of the perpetrators possessed a gun. The trial court relied on the same testimony to determine that Alleyne or his accomplice brandished a gun. The testimony was the same, but the findings were different. The jury found that Alleyne possessed a gun, but made no finding with regard to whether the weapon was brandished. The court, however determined that the gun was brandished. The Supreme Court reviewed the statutory punishment structure, which included a mandatory minimum sentence of five years if a crime of violence was committed while the offender carried a

firearm, seven years if the firearm was brandished, and ten years if the firearm was discharged during the crime. 18 U.S.C. 924(c)(1)(A). The crime was otherwise punishable by a term of imprisonment not exceeding 20 years. 18 U.S.C.1951 (a). The court held that where facts were not found by a jury that enhanced the mandatory minimum penalty for a crime, principles of the Sixth Amendment were violated. Specifically, "[b]ecause mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." 570 U.S. at 103. *See, State v. Fort,* 8th Dist. Cuyahoga No. 100346, 17 N.E.3d 1172, 2014-Ohio-3412, ¶29. However, the majority in *Alleyne* was careful to declare that:

In holding that facts that increase mandatory minimum sentences must be submitted to the jury, we take care to note what our holding does not entail. Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment. *See, e.g., Dillon v. United States*, 560 U.S. 817, ——, 130 S.Ct. 2683, 2692, 177 L.Ed.2d 271 (2010) ("[W]ithin established limits [,] ... the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts" (emphasis deleted and internal quotation marks omitted)); *Apprendi*, 530 U.S. at 481, 120 S.Ct. 2348 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute").

*Alleyne*, 570 U.S. at 116. *See also, State v. Salim,* 5th Dist. Guernsey No. 13 CA 28, 2014-Ohio-357, ¶19.

**{¶86}** Under the Reagan Tokes Law, the judge imposes both a minimum and a maximum sentence. Judicial fact-finding is not required. In Ohio, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124 paragraphs 1 and 11. The Department of Rehabilitation and Correction ("DRC") is not permitted to extend a sentence imposed by the trial court beyond the maximum sentence imposed by the trial court. Further, the facts which postpone an inmate's release date are facts found as a result of prison disciplinary proceedings, not the underlying crime. To extend Wolff's argument to its logical end it would be necessary for the courts to invalidate punishment as a result of internal prison disciplinary proceedings entirely, or require all rule infractions to be tried before a jury.

**{¶87}** It is evident that *Apprendi* and its progeny have no application in a prison disciplinary setting where the DRC does not have the authority to extend the inmate's sentence beyond the maximum sentence imposed by the trial judge. We find that appellant's right to a jury trial was thus not violated.

### Conclusion

**{¶88}** Accordingly, we find that the Reagan Tokes Law is constitutional. The Second District Court of Appeals found the law constitutional in *State v. Barnes*, 2nd Dist. Montgomery No. 28613, 2020-Ohio-4150, *State v. Leet*, 2nd Dist. Montgomery No. 28670, 2020-Ohio-4592, and *State v. Ferguson*, 2nd Dist. Montgomery No. 28644, 2020-

Ohio-4153. The Third District found the law constitutional in *State v. Hacker,* 3rd Dist. Logan No. 8-20-01, 2020-Ohio-5048. The Twelfth District Court of Appeals also determined the law was constitutional in *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, and *State v. Morris*, 12th Dist. Butler No. CA2019-12-205, 2020-Ohio-4103. Moreover, in *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470, the court, sitting en banc, held that the Reagan Tokes Law is constitutional in that it does not violate the separation-of-powers doctrine and does not violate either a defendant's right to a jury trial or due process of law.

**{¶89}** Appellant's first assignment of error is, therefore, overruled.

II

**{¶90}** Appellant, in his second assignment of error, argues that his trial counsel was ineffective in failing to move for a waiver of court costs at the time of sentencing since appellant was indigent. We disagree.

In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance. *Bradley*, 42 Ohio St.3d at 141-142, 538 N.E.2d 373; *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. See *Bradley*[1] at paragraphs two and three of the syllabus. 'A reasonable probability is a

---

[1] *State v. Bradley*, 42 Ohio St.3d 136, 38 N.E.2d 378.

probability sufficient to undermine confidence in the outcome.' *Id.* at 142,

538 N.E.2d 373, quoting *Strickland*[2] at 694, 104 S.Ct. 2052.

*State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560 at paragraph 10.

**{¶91}** The Supreme Court of Ohio held "* * *when trial counsel fails to request that the trial court waive court costs on behalf of a defendant who has previously been found to be indigent, a determination of prejudice for purposes of an ineffective-assistance-of-counsel analysis depends upon whether the facts and circumstances presented by the defendant establish that there is a reasonable probability that the trial court would have granted the request to waive costs had one been made." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 16.

**{¶92}** In the case sub judice, appellant argues that his trial counsel's failure to file a motion to waive court costs at the time of sentencing constituted ineffective assistance of counsel when appellant had previously been found indigent.

**{¶93}** The trial court, in this matter, chose to waive the mandatory fine and not to impose any discretionary fine and found appellant to be indigent. While it ordered appellant to pay court costs, the trial court did not order him to pay any part of his court-appointed attorney's fees.

**{¶94}** Based on the foregoing, we find that there is not a reasonable probability that the trial court would have granted the request to waive costs had one been made. The trial court, in this matter, *sua sponte* waived the mandatory fine and counsel fees and clearly chose not to waive the court costs.

**{¶95}** Appellant's second assignment of error is, therefore, overruled.

---

[2] *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 22052, 80 L.Ed 2nd 674.

**III**

{¶96} Appellant, in his third assignment of error, argues that his conviction for aggravated possession of drugs is against the manifest weight of the evidence. We disagree.

{¶97} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

{¶98} Appellant, in the case sub judice, was convicted of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(c). R.C. 2925.11 states, in relevant part, as follows:

{¶99} "(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog….

{¶100}          (C)   Whoever violates division (A) of this section is guilty of one of the following:

{¶101}          (1)   If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marihuana, cocaine, L.S.D., heroin, any fentanyl-related compound, hashish, and any controlled substance analog, whoever violates division (A) of this section is guilty of aggravated possession of drugs. The penalty for the offense shall be determined as follows: …

{¶102}    (c) If the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount, aggravated possession of drugs is a felony of the second degree, and the court shall impose as a mandatory prison term a second degree felony mandatory prison term.

{¶103}    Possession is defined as 'having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found.' R.C. 2925.01(K). Possession may be actual or constructive.' *State v. Mathias*, 5th Dist. Morrow No. 2020CA0001, 2021-Ohio-423, 2021 WL 597705, ¶ 75 citing *State v. Taylor*, 5th Dist. Richland No. 2019 CA 0117, 2020-Ohio-5097, 2020 WL 6342838, ¶ 22 citing *State v. Garza*, 5th Dist. Stark No. 2020CA00018, 2020-Ohio-4001, 2020 WL 4568953, ¶ 16 citing *State v. Butler*, 42 Ohio St.3d 174, 176, 538 N.E.2d 98 (1989). Thus, the issue of whether a person charged with drug possession knowingly possessed a controlled substance "is to be determined from all the attendant facts and circumstances available." *State v. Mathias*, supra at ¶ 76 quoting *State v. Teamer*, 82 Ohio St.3d 490, 492, 1998-Ohio-193, 696 N.E.2d 1049.

{¶104}    To establish constructive possession, the evidence must prove the defendant was able to exercise dominion and control over the contraband. *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976). Dominion and control may be proven by circumstantial evidence alone. *Garza, supra*, at ¶ 16, citing *State v. Trembly*, 137 Ohio App.3d 134, 738 N.E.2d 93 (8th Dist.2000). Circumstantial evidence establishing the defendant was located in very close proximity to the contraband may show constructive possession. *State v. Butler, supra*; *State v. Morales*, 5th Dist. Licking

No. 2004 CA 68, 2005-Ohio-4714, ¶ 50. "Establishment of ownership is not required." *State v. Rastbichler*, 2nd Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 33.

**{¶105}** Appellant specifically argues that he was never found in possession of an illegal substance, that no forensic testing linked him to the offense, and that no one testified that he ever possessed drugs. He notes that his mother was in possession of the drugs on September 21, 2020 when the warrant was executed on her home and led the officers to the locked lockbox in her closet. He further points out that she entered a plea of guilty to possession.

**{¶106}** However, we find that, using all the attendant facts and circumstances available, the jury did not lose its way in convicting appellant because there was testimony that appellant exercised dominion and control over the drugs. As noted by appellee, the testimony of Detective Carpenter established appellant's connection to the drugs. The drugs were in appellant's car which was picked up by appellant's mother at appellant's direction after the traffic stop. Detective Carpenter testified that, on September 8, 2020, appellant, during a phone call from the jail, asked his mother if she got everything out of his car and made sure that nothing was thrown away. He further told his mother that there was a lot of money. He indicated to his mother that he was using "key words" during the recorded conversation and that she was not to sell any of his clothes.   Appellant told his mother to put everything in the lockbox, not to mess with it, and that there was like $4,000.00.

**{¶107}** During a telephone conversation of September 10, 2020, appellant asked his mother whether there was anything in the lockbox when she got it out of his bedroom. Appellant referred to  the stuff in his lockbox as "ice cream" and told his mother

that ice cream melts and that she should not keep it anywhere hot. He also told his mother that he had spent "like $4,000" on the "ice cream". Detective Carpenter testified that "ice cream" was lingo for crystal methamphetamines. During the same conversation, appellant said that he was glad that his car had not been towed.

**{¶108}** Detective Carpenter testified that appellant, during a call on September 11, 2020, asked his mother if "that shit [was] locked up?" Trial Transcript at 273. Appellant, during a conversation with his mother on September 15, 2020, stated "everything, my stuff all locked up, all my clothes, … before you got my clothes out of my car, wasn't there already clothes in my box." Trial Transcript at 273. Appellant told his mother that he was not actually talking about clothes. Finally, there was testimony that during a September 19, 2020 conversation with his father, appellant told his father that he had called his mother to come and get the car before it was towed "because he had QP in there" and that he had a "QP of jeans sitting at Mom's now." Trial transcript at 279. Detective Carpenter testified that appellant was referring to methamphetamines. He further testified that the drugs were found in the lockbox that appellant was talking about.

**{¶109}** In short, there was testimony that appellant was in possession of the drugs when he was in the car and that he directed his mother to come and get the car. Appellant then directed his mother, as evidenced by the telephone calls, to get everything out of the car and lock it up a lockbox. He told his mother that he had spent like $4,000.00 to get the "ice". The drugs were found at appellant's mother's house in the lockbox where he directed her to put them.

**{¶110}** Based on the foregoing, we find that the jury did not lose its way in convicting appellant of aggravated possession of drugs. There was testimony that

appellant, via his mother, exercised dominion and control over the drugs. Appellant's conviction, therefore, is not against the manifest weight of the evidence.

**{¶111}**       Appellant's third assignment of error is, therefore, overruled.

**{¶112}**       Accordingly, the judgment of the Guernsey County Court of Common Pleas is affirmed.

By: Baldwin, J.

Wise, John, P.J. and

Delaney, J. concur.