[Cite as *State v. Abdullah*, 2022-Ohio-3977.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2021-L-051 |
| Plaintiff-Appellee, | |
| - v - | Criminal Appeal from the Court of Common Pleas |
| RASHIED M. ABDULLAH, | |
| Defendant-Appellant. | Trial Court No. 2020 CR 000601 |

### O P I N I O N

Decided: November 7, 2022
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Melissa A. Blake*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Rashied M. Abdullah, appeals from his convictions and sentence for Rape, Felonious Assault, and Kidnapping, following a jury trial in the Lake County Court of Common Pleas. For the following reasons, we affirm the decision of the lower court.

{¶2} On August 14, 2020, the Lake County Grand Jury issued an Indictment, charging Abdullah with Rape (Count One), a felony of the first degree, in violation of R.C. 2907.02(A)(2); two counts of Felonious Assault (Counts Two and Three), felonies of the

second degree, in violation of R.C. 2903.11(A)(1) and (2); and three counts of Kidnapping (Counts Four, Five, and Six), felonies of the first degree, in violation of R.C. 2905.01(A)(2), (3), and (4).

{¶3} A jury trial was held on January 26-28, 2021. The following pertinent testimony and evidence were presented:

{¶4} On June 26, 2020, T.W., a 17-year-old, was walking to various locations near her home to fill out job applications. T.W. testified that, as she was walking, a man unknown to her, later identified as Abdullah, pulled up in a vehicle and asked her name. T.W. wanted to get to know him and accepted his offer for a ride home. He requested her phone number and later sent her a text message asking to "chill." T.W. agreed and he picked her up. They went to a lake and walked around, sat together, and hugged. He touched her buttocks and she asked him to stop, which he did. She subsequently asked him to drive her home and he responded that he needed to pick something up from his residence. He drove to a hotel and told T.W. that he was staying there because he travels often. After Abdullah paid at the front desk, the two went to a hotel room.

{¶5} According to T.W., after entering the room, Abdullah went to the restroom, exited with his shirt off, sat on the bed, and asked her to "come over." She then requested to go home. He began kissing her, she pulled away and said no, telling him she needed to return home because she had snuck out. He became aggressive, grabbed her arm, got on top of her and kissed her. She tried to push him off and said she did not want to have sex. After she told him to get off of her multiple times, he punched her in the face. She asked to leave again, he said no, and continued to punch her in the face.

{¶6} According to T.W., Abdullah then started to pull down her pants, she

2

grabbed his hand, and he punched her in the face again. She testified that he "put his fingers in me." She explained that she was wearing her underwear at the time, and he placed his hand inside the top of her underwear. He then exposed himself. She tried to use the restroom and he jumped up and stopped her. She asked him to turn on the light in an attempt to get him to walk away and then removed a box cutter from her purse. He removed his clothes and asked her to get on top of him and she did so because he ordered her to. He kissed her, and when she again said she did not want to have sex with him and he should get a prostitute, he became mad, grabbed her by the neck and punched her again. She then cut him on the neck with the box cutter, and they began pushing each other. She ran to the door to leave but he kicked it with his foot, bit her on the back and punched her in the face, causing her to fall and black out. During the struggle, Abdullah grabbed her hand with the boxcutter and "made [her] cut [her]self on" the thigh. After he bit her on the face, there was a struggle and she was able to get away. T.W. found a guest at the hotel who called police. When police arrived, she told them Abdullah had taken her from her house at gunpoint because she did not want her parents to know she snuck out.

{¶7}    On cross-examination, T.W. stated that she had been voluntarily hugging Abdullah and was voluntarily at the hotel, although she believed they were just there for him to pick up his clothing.

{¶8}    Anthony DiDona, a Wickliffe Police Department Patrolman, responded to a dispatch at the Quality/Econo Lodge, and saw the victim, who was wearing a towel stained in blood and had a swollen forehead and cheeks and cuts on her body. She was out of breath, stated "he just tried to rape me," and described Abdullah. According to

3

DiDona, T.W. told him she had encountered Abdullah earlier that day and he later abducted her from her home at gunpoint. DiDona testified that T.W. described the events in a manner similar to her testimony, including the denial of Abdullah's physical advances and the struggle within the hotel room. T.W. told DiDona that Abdullah inserted a finger in her vagina. DiDona photographed her injuries at the hospital, which included bruising and scrapes on her leg, chest, arms and shoulder, bite marks on her shoulder and cheek, and swelling on her face. He testified that, by the way T.W. was acting, it appeared she had been through a high stress event.

{¶9} Danielle Stoehr, a registered nurse, spoke with T.W. at the hospital. According to her testimony, T.W. told her a version of events similar to her testimony, which included Abdullah taking her to the hotel at gunpoint and her refusal to have sex. Stoehr indicated that T.W. stated Abdullah had taken off her underwear and "put his fingers in there." Stoehr described T.W. as sad, upset, and tearful. After a physical examination, she found no injury to T.W.'s vaginal area.

{¶10} Patrick Hengst, a former Wickliffe Police Department Lieutenant, spoke to T.W. at the hospital to clarify whether she was taken at gunpoint, as he felt this fact was inconsistent with the evidence and video from the hotel. She admitted that this statement was untrue and that she snuck out of her house to meet with him. As to the assault, she told him that he pulled her underwear down in order to rape her.

{¶11} Hengst testified that when Abdullah was subsequently arrested, Hengst observed that he had cuts that were healing. He interviewed Abdullah and a video of the interview was played for the jury. In that interview, Abdullah stated that T.W. pulled a knife on him because he would not drive her home, that any activity between the two was

4

consensual, and that he did not "remember if a finger or two may have slid in her vagina."

{¶12} Dr. Karen Zavarella of the Lake County Crime Laboratory testified that DNA from swabs taken from a bitemark, T.W.'s hand, inner thigh, and fingernails, and the interior crotch area of her shorts were consistent with Abdullah's DNA. The box cutter contained DNA from both T.W. and Abdullah. Vaginal swabs contained too much female DNA to identify any male DNA.

{¶13} During the trial, the State moved to dismiss Count Four as duplicative. At the close of the State's case, the defense moved for acquittal pursuant to Crim.R. 29, which motion was denied.

{¶14} The jury found Abdullah guilty of Rape, Felonious Assault, and two Counts of Kidnapping, as charged in the indictment. The verdict was memorialized in a February 1, 2021 Judgment Entry.

{¶15} A sentencing hearing was held on March 29, 2021, and the sentence was memorialized in a Sentencing Entry. The court merged the counts of Felonious Assault and the counts of Kidnapping. Defense counsel indicated this was Abdullah's first sex offense and that most of his prior convictions were for theft related offenses. T.W. stated that this had "put [her] through a lot." The State argued that consecutive sentences were necessary and requested a sentence of at least twenty years in prison. The court stated its consideration of the factors under R.C. 2929.11 and .12 and that the imposed sentence was "a minimum of six years and a maximum of nine years" for the counts of Rape and Felonious Assault and "a minimum of eight years and a maximum of twelve years" for Kidnapping, the aggregate minimum was 20 years, and the aggregate maximum was 24 years. The court ordered all three sentences to be served consecutively. The court

5

found, at the hearing and in its sentencing entry, that the consecutive sentences are necessary to protect the public from future crime or punish the defendant, that they were not disproportionate to the seriousness of his conduct and the danger posed to the public, and the offenses were committed as part of a course of conduct and Abdullah's history of criminal conduct demonstrates consecutive sentences are necessary to protect the public. In the sentencing entry, the court stated that the defendant "has been sentenced to a minimum term on each qualifying count as detailed below" and included a chart which stated the sentences for Rape and Felonious Assault as "6 years Minimum (Maximum 9 years)" and Kidnapping as "8 years Minimum (Maximum 12 years)." The entry also stated: "Having imposed the minimum terms on Counts 1, 3, and 5, the Court further sentences the defendant to an aggregate minimum term of 20 years and an aggregate maximum term of 24 years."[1]

{¶16} Abdullah timely appeals and raises the following assignments of error:

{¶17} "[1.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim.R. 29(A).

{¶18} "[2.] The trial court erred to the prejudice of the defendant-appellant when

---

1. Although not raised by the parties, we observe that the court stated both a minimum and maximum term for all three offenses at the sentencing hearing and parenthetically in the entry. Pursuant to R.C. 2929.144(B)(2), if an offender is ordered to serve consecutive sentences for felonies, where at least one felony is a qualifying offense, "the court shall add all of the minimum terms imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree that are to be served consecutively and all of the definite terms of the felonies that are not qualifying felonies * * *, and the maximum term shall be equal to the total of those terms so added by the court plus fifty per cent of the longest minimum term or definite term for the most serious felony being sentenced." Here, although the trial court did mention maximum terms for each of the offenses, which were qualifying offenses, it also correctly stated the minimum terms and added the three minimum terms to half of the maximum for the most serious offense to arrive at the correct sentence, 20 to 24 years in prison. It also indicated that it had "imposed the minimum terms on Counts 1, 3, and 5." Since the prison term ordered is consistent with R.C. 2929.144(B)(2), we find no reversible error as to the court's sentence in relation to this issue.

6

it returned a verdict of guilty against the manifest weight of the evidence.

{¶19} "[3.] The trial court's order of consecutive sentences for an aggregate minimum of twenty years pursuant to 2929.14(C) was not supported by the record and is contrary to law.

{¶20} "[4.] The defendant-appellant's constitutional challenges to the indeterminate prison sentence of twenty to twenty-four years that was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, are ripe for review.

{¶21} "[5.] The defendant-appellant's indeterminate prison sentence of twenty to twenty-four years that was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, must be reversed as the Reagan Tokes Act is unconstitutionally void for vagueness.

{¶22} "[6.] The defendant-appellant's indeterminate prison sentence of twenty to twenty-four years that was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, must be reversed as the Reagan Tokes Act unconstitutionally violates the doctrine of separation of powers.

{¶23} "[7.] The defendant-appellant's indeterminate prison sentence of twenty to twenty-four years that was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, violates his constitutional right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 5 of the Ohio Constitution.

{¶24} "[8.] The defendant-appellant's indeterminate prison sentence of twenty to twenty-four years that was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, violates his constitutional rights to fair trial and due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I,

7

Sections 5 & 10 of the Ohio Constitution."

{¶25} In his first and second assignments of error, Abdullah argues that the lower court erred in denying his motion for acquittal and that his convictions were against the weight and sufficiency of the evidence, raising similar arguments alleging that there was a lack of credible evidence supporting the crimes for which he was convicted. Since these issues are interrelated, we will address them jointly.

{¶26} "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. "Thus, when an appellant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state." (Citation omitted.) *State v. Hastings*, 11th Dist. Portage No. 2020-P-0014, 2021-Ohio-662, ¶ 23. In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶27} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence

8

is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387. "Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the *weight* of the evidence necessarily must include a finding of sufficiency.'" (Citation omitted.) *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

{¶28} As an initial matter, we need not consider sufficiency or manifest weight arguments as they relate to Counts 2 (Felonious Assault in violation of R.C. 2903.11(A)(1)) and 6 (Kidnapping in violation of R.C. 2905.01(A)(4))[2], since these were merged at sentencing. As this court has held, where allied offenses are merged and there is sufficient evidence on the offense for which defendant is sentenced, errors relating to sufficiency and weight of the evidence on the count that is merged are harmless and need not be considered. *State v. Mugrage*, 11th Dist. Portage No. 2020-P-0066, 2021-Ohio-4136, ¶ 133; *State v. Whetstone*, 11th Dist. Lake No. 2015-L-114, 2016-Ohio-6989, ¶ 26.

---

2. The State contends in its brief that renumbered Count 4 (original Count 5), Kidnapping in violation of R.C. 2905.01(A)(3), was the offense that merged. However, this does not appear consistent with the court's statements at the sentencing hearing and in its sentencing entry. While the court renumbered the counts one through five for the jury when original Count 4 was dismissed, in its sentencing entry, the chart of offenses for which Abdullah was convicted retained the original numbers. The court stated at the hearing and in the entry that "Counts 5 and 6 merge" and that the State elected to proceed on Count 5. It could only have been referencing the counts as originally numbered, since Count 6 no longer existed when the counts were renumbered. It further mentioned that for Count 5, inflicting serious physical harm was an element, which relates to R.C. 2905.01(A)(3), original Count 5. Thus, although the State addresses only the weight and sufficiency of the evidence as to original Count 6, we will address original Count 5, Kidnapping for the purpose of inflicting harm, as this is consistent with the merger as stated by the trial court.

9

Case No. 2021-L-051

{¶29} To convict Abdullah of Rape, the State was required to prove, beyond a reasonable doubt, that he did "engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). Sexual conduct is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

{¶30} As to sufficiency, Abdullah argues that there was "little to no evidence" to support a finding that he penetrated the victim. Regarding manifest weight, he argues that there was no physical evidence to corroborate the victim's testimony and she lacked credibility.

{¶31} We emphasize that there was evidence of penetration through the victim's testimony that he penetrated her with his fingers. Nurse Stoehr and Patrolman DiDona also testified that the victim told them this occurred. This evidence supports the element of sexual conduct as defined above and is sufficient to support a Rape conviction.

{¶32} As to the weight of the evidence, the lack of physical evidence does not preclude a conviction where there is testimony demonstrating sexual conduct. *State v. Henderson*, 11th Dist. Trumbull No. 2001-T-0047, 2002-Ohio-6715, ¶ 36 (the State may prove that sexual conduct occurred "through either physical evidence and/or witness testimony"); *State v. Waskelis*, 11th Dist. Portage No. 2011-P-0035, 2012-Ohio-3030, ¶ 46, citing *In re N.Z.,* 11th Dist. Lake Nos. 2010-L-023, et al., 2011-Ohio-6845, ¶ 79 ("no physical evidence is required to corroborate a victim's testimony in a rape case,

10

Case No. 2021-L-051

and the sole testimony of the victim can support a conviction"). It is not unexpected that there would be no sign of physical injury since the victim did not testify as to any injury that occurred from the sexual conduct. Additionally, the lack of Abdullah's DNA in T.W.'s vaginal area was explained by Dr. Zavarella: "there was far too much female DNA to ever elucidate or detect a male DNA profile," and, due to the high concentration of female cells in that area of the body, "the small amount of DNA left behind by any kind of digital penetration is typically difficult to ever get * * * a DNA profile using standard means."

{¶33} Further, as to the issues of credibility raised by Abdullah, particularly that the victim lied about being abducted at gunpoint, we do not find these issues rise to the level of removing the decision of credibility from the hands of the jurors. "Since the jury is in the best position to assess credibility, we generally decline to second guess its credibility determinations." *State v. Tiggett*, 11th Dist. Trumbull No. 2018-T-0036, 2019-Ohio-1715, ¶ 34. The fact that T.W. lied about being taken at gunpoint does not necessarily mean the jury should or would find she was untruthful about the other parts of her story, particularly where she provided a credible explanation for her dishonesty, i.e., that she did not want her parents to know she snuck out, and where she immediately told the truth when confronted. Other minor alleged inconsistencies in her story, such as whether she felt safe when entering the hotel, did not bear on the conduct that later occurred in the hotel room which gave rise to the convictions or render the convictions unsupported by the weight of the evidence. *See State v. Carswell*, 6th Dist. Sandusky No. S-20-001, 2021-Ohio-3379, ¶ 51 (where cross-examination "arguably revealed some inconsistencies in [a witness'] testimony, the jury's resolution of factual and credibility disputes in this case against appellant does not equate to a finding that the jury's verdict

11

was against the manifest weight of the evidence"). Her statements regarding whether her underwear were on or off may have been inconsistent immediately after the event when she was in a state of distress but she gave clear testimony that Abdullah reached into the top of her underwear and the jurors were in the best position to evaluate whether this detail impacted her credibility. Furthermore, the Assault and Kidnapping convictions were corroborated by other evidence, such as her extensive physical injuries and the state of the hotel room where the incident occurred, buttressing her credibility.

{¶34} In relation to Felonious Assault, Abdullah argues that there was insufficient evidence to show he knowingly caused physical harm since biting and use of the boxcutter occurred only after he was attacked by the victim and that the victim's claims of physical assault were not substantiated by the physical injuries. He reiterates these arguments as to the manifest weight.

{¶35} To convict Abdullah of Felonious Assault for Count Three, the State was required to prove that he knowingly "[c]ause[d] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).

{¶36} As to Abdullah's claim that he bit the victim and/or cut her with the box cutter only after he was attacked by her, this is rebutted by T.W.'s testimony. She testified to using the box cutter only after she had been punched and attacked by Abdullah, utilizing it to defend herself from his physical assault. She testified specifically that she was bitten after she tried to escape the room. Under this version, while T.W. tried to exit the room, Abdullah continued to physically harm her, which would rebut allegations that his actions were justified to defend himself. While Abdullah's statement to police reiterated that he physically assaulted T.W. only to defend himself, this version of events

12

Case No. 2021-L-051

contained inconsistencies, including the presence of blood on the bed although he stated no assault occurred there, his failure to recall biting T.W. although she had bite marks with his DNA on her body, and his fleeing of the scene and failure to seek immediate medical treatment although he claims he acted in self-defense. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan,* 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). If the victim's version of events was believed, which was the case here, all of the elements of Felonious Assault were supported by the evidence, as she testified not only to physical assault through punching and bites, but also that Abdullah cut her with the box cutter, which caused wounds requiring stitches.

{¶37} Abdullah's argument that T.W.'s mouth and nose did not bleed despite her claims that she was punched in the face, advanced to prove her untruthfulness, is unavailing. Regardless of whether her face bled, there can be no legitimate dispute that she suffered injuries, as she had various cuts and bruises all over her body and witnesses indicated she had facial swelling.

{¶38} Finally, to convict Abdullah of Kidnapping, the State was required to prove that he, "by force, threat, or deception, * * * remove[d] another from the place where the other person is found or restrain[ed] the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim." R.C. 2905.01(A)(3).

{¶39} Abdullah argues that there was a lack of evidence to demonstrate that he "acted with purpose to terrorize or inflict serious physical harm on T.W." as she admitted she went to the hotel room with him voluntarily.

13

Case No. 2021-L-051

{¶40} In the present matter, while it is accurate that there is evidence showing T.W. went to the hotel voluntarily, it also demonstrates he was deceptive in stating he was going there to pick something up rather than to make inappropriate sexual advances. Nonetheless, even presuming T.W. was in the room voluntarily, kidnapping can occur not only by removing the victim to a certain place but also by restraining her liberty within that place. Here, the evidence showed that T.W. attempted to leave the room but was prevented from doing so by Abdullah through physical force, which is sufficient to support the restraint of liberty element. *See State v. Purvis*, 9th Dist. Medina No. 05CA0053-M, 2006-Ohio-1555, ¶ 22-23 (preventing the victim from leaving the home constituted kidnapping where the defendant restrained and beat her as part of a course of conduct). Further, the evidence showed that, after preventing her from leaving, Abdullah continued to assault her, demonstrating that she was restrained for the purpose of assaulting and terrorizing her. As to issues raised regarding the victim's credibility, this has been fully addressed above.

{¶41} As noted above, the trial court's sentencing entry indicates that the conviction for Kidnapping for the purpose of sexual activity was merged, and thus, consideration of this issue is not required. Nonetheless, we briefly observe that similar arguments apply to the weight of the evidence here. The testimony, if found credible, supported a contention that sexual activity occurred and that T.W. was restrained and prevented from leaving due to Abdullah's intent to attempt sexual activity with her. *See* R.C. 2905.01(A)(4) (Kidnapping occurs when the liberty of a victim is restrained "[t]o engage in sexual activity * * * with the victim against the victim's will").

{¶42} The first and second assignments of error are without merit.

14

{¶43} In his third assignment of error, Abdullah argues that the imposition of consecutive sentences was not supported by the record, emphasizing that he does not have a history of committing sex-oriented offenses and the harm to the victim was not so great that it prevented her from lying in relation to the allegations.

{¶44} "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence * * * given by the sentencing court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, or * * * [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2)(a) and (b).

{¶45} "Under R.C. 2929.14(C)(4), a sentencing court is required to make three distinct findings in order to require an offender to serve consecutive prison terms: (1) that consecutive sentences are 'necessary to protect the public from future crime or to punish the offender'; (2) that consecutive sentences are 'not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public'; (3) 'and * * * also' that one of the circumstances described in subdivision (a) to (c) is present." (Citation omitted.) *State v. Claar*, 11th Dist. Portage No. 2019-P-0091, 2020-Ohio-1330, ¶ 11. The applicable factors here, subdivisions (b) and (c), require findings that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct" which caused harm so great a single prison term would not reflect the seriousness of the conduct or "[t]he offender's history of criminal conduct demonstrates that consecutive

15

sentences are necessary to protect the public from future crime by the offender." To impose consecutive terms, the court "is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

{¶46} In relation to findings necessary to order consecutive sentences, this court has explained that "the court of appeals * * * must clearly and convincingly find that the record does not support the court's findings," a standard characterized as "extremely deferential." (Citation omitted.) *State v. Guth*, 11th Dist. Portage No. 2015-P-0083, 2016-Ohio-8221, ¶ 23, quoting *State v. Rodeffer*, 2d Dist. Montgomery Nos. 25574, et al., 2013-Ohio-5759, ¶ 31; *State v. Forsell*, 11th Dist. Portage Nos. 2019-P-0116, et al., 2020-Ohio-5381, ¶ 15. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29.

{¶47} As to the findings that consecutive sentences are necessary to protect the public from future crime, Abdullah argues that he does not have a history of this type of crime or an extensive criminal record. However, the Presentence Investigation Report indicates that he has several convictions for misdemeanor theft offenses and multiple felony convictions for Forgery, Attempted Aggravated Assault, Grand Theft, and Having Weapons While Under Disability. His repeated criminal activity warrants a finding that this sentence was necessary to protect the public from future crime. Further, the PSI indicates that Abdullah had other pending Rape and Kidnapping charges in Cuyahoga County at the time of sentencing.

16

{¶48} The cases cited by Abdullah, wherein consecutive sentences were vacated, are factually distinguishable. The defendant in *State v. Hawley*, 2020-Ohio-1270, 153 N.E.3d 714 (8th Dist.), had only misdemeanor convictions and had not been charged with any sex offenses while the defendant in *State v. Regalo*, 8th Dist. Cuyahoga No. 108430, 2020-Ohio-917, had no criminal record at all. Here, the defendant's history of felony offenses as well as charges for sex offenses differentiates this case from the foregoing and justified the sentence.

{¶49} Abdullah also argues that the finding regarding the level of harm caused was not supported by the record, primarily emphasizing that T.W. lied about being held at gunpoint, which demonstrated that the harm was "not so severe." It is unclear how the victim's dishonesty about this fact, which she explained was due to her fear of getting in trouble for sneaking out, demonstrated that the harm from the crimes was not severe. She suffered a variety of physical injuries, including two bites and serious cuts on her body as well as a swollen and bruised face. Testimony from several witnesses demonstrated the distress she was in after the incident and her statement at the sentencing hearing indicated she was "still hurt about what happened" and that Abdullah "put [her] through a lot." The conduct of raping her, threatening to kill her, and repeatedly hitting her while disallowing her to leave the hotel room was serious and we cannot clearly and convincingly determine this finding was unsupported by the record.

{¶50} The third assignment of error is without merit.

{¶51} In his fourth through eighth assignments of error, Abdullah challenges the Reagan Tokes Act, arguing that indeterminate sentences raise constitutional concerns.

{¶52} The Reagan Tokes Act requires the sentencing court to order a minimum

17

prison term for sentences under R.C. 2929.14(A)(1)(a) or (2)(a) and a maximum prison term as determined by R.C. 2929.144(B). The Act includes a presumption that an offender shall be released on the expiration of his minimum term or earned early release date, but the Department of Rehabilitation and Corrections "may rebut the * * * presumption if it determines at a hearing that certain statutorily enumerated factors apply." *State v. Ferguson*, 11th Dist. Lake No. 2020-L-031, 2020-Ohio-5578, ¶ 8. "If the DRC rebuts the presumption, it may maintain the offender's incarceration after the expiration of the minimum prison term or presumptive earned early release date for a reasonable period of time, which 'shall not exceed the offender's maximum prison term.'" *Id.*, citing R.C. 2967.271(D)(1).

{¶53} As to all challenges raised by Abdullah, we observe that "we are to presume that [a] state statute is constitutional, and the burden is on the person challenging the statute to prove otherwise beyond a reasonable doubt." *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 17.

{¶54} In his fourth assignment of error, Abdullah argues that the constitutional issues are ripe for review.

{¶55} *In State v. Maddox*, __ Ohio St.3d __, 2022-Ohio-764, __ N.E. 3d __, the Ohio Supreme Court recently held that the Reagan Tokes Law is ripe for review. In *Maddox*, the Court held that a "challenge to the statute's constitutionality is ripe for review on direct appeal because (1) [appellant] has been sentenced under the statute, (2) no further factual development is necessary for a court to analyze the challenge, and (3) delaying review would result in duplicative litigation forcing [defendants] to endure potential violations of their constitutional rights in order to challenge the law." *Id.* at ¶ 11.

18

Case No. 2021-L-051

Therefore, we hold that Abdullah's challenge to the constitutionality of the Reagan Tokes Law is ripe for review and will proceed to consideration of the merits of the remaining assigned errors.

{¶56} Abdullah's fourth assignment of error is with merit to the extent discussed above.

{¶57} In Abdullah's fifth assignment of error, he argues that R.C. 2967.271(C) is void for vagueness and does not provide him with a sufficient understanding of what conduct could result in the indeterminate portion of his sentence being invoked, citing in support of his argument *State v. Delvallie*, 2021-Ohio-1809, 173 N.E.3d 544 (8th Dist.), which was vacated by the Eighth District sitting en banc in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.) (upholding the constitutionality of the Reagan Tokes Law).

{¶58} "'[A] law will survive a void-for-vagueness challenge if it is written so that a person of common intelligence is able to ascertain what conduct is prohibited, and if the law provides sufficient standards to prevent arbitrary and discriminatory enforcement.'" (Citations omitted.) *Klein v. Leis,* 99 Ohio St.3d 537, 2003-Ohio-4779, 795 N.E.2d 633, ¶ 16. A tripartite analysis must be conducted to address a void for vagueness challenge: the statute must provide "adequate notice and fair warning to persons of ordinary intelligence so that they can conform their conduct to the dictates of the statute;" it cannot permit arbitrary and discriminatory enforcement; and it cannot unreasonably hinder fundamental constitutional freedoms. *State v. Collier*, 62 Ohio St.3d 267, 270, 581 N.E.2d 552 (1991)*. See also Perez v. Cleveland*, 78 Ohio St.3d 376, 378, 678 N.E.2d 537 (1997) ("when a statute is challenged under the due process doctrine of vagueness, a court must determine whether the enactment (1) provides sufficient notice of its proscriptions and (2)

19

contains reasonably clear guidelines to prevent official arbitrariness or discrimination in its enforcement").

{¶59} In *State v. Williams*, 88 Ohio St.3d 513, 728 N.E.2d 342 (2000), the Ohio Supreme Court found a sex offender classification statute was not vague where it did not prohibit specific conduct but established remedial registration and notification, since such remedial measures "require less specificity to satisfy a void-for-vagueness challenge than do criminal statutes." *Id.* at 533. Applying this analysis, the Fifth District found that postrelease control enactments were also not unconstitutionally vague, emphasizing that they did not prohibit specific conduct. *State v. Hopkins*, 5th Dist. Stark Nos. 2000CA00053 and 2000CA000054, 2000 WL 1751286, *4 (Nov. 27, 2000).

{¶60} The foregoing is applicable to the Reagan Tokes Law. R.C. 2967.271(B) establishes a rebuttable presumption that the offender shall be released upon the expiration of the minimum prison term or early release date, whichever is earlier. Division (C) provides a detailed description of means by which that presumption may be overcome, including commission of institutional rule infractions, the offender's security level classification, and when the behavior while incarcerated demonstrates a continued threat to society. As in *Williams*, R.C. 2967.271 does not prohibit any specific conduct. Therefore, the statute requires less specificity than a typical criminal enactment.

{¶61} Further, Abdullah contends that Reagan Tokes is vague in that he is unaware of what constitutes an "unprosecuted" violation or a lack of rehabilitation that justifies rebutting the presumption of release. As he raises a similar argument in relation to due process in the eighth assignment of error, this will be addressed below.

20

**{¶62}** We observe, however, that, as the en banc panel in *Delvallie* explained, the Reagan Tokes Law does not create a new prison rule infraction system; Ohio Adm.Code 5120-0-08 sets forth "an inmate's rights and the procedures the Rules Infraction Board are to follow in imposing any and all institutional infractions upon the inmates. *See, e.g., Oko v. Lake Erie Corr. Inst.*, 11th Dist. Ashtabula No. 2010-A-0002, 2010-Ohio-2821, 2010 WL 2499702, ¶ 3 (overruling a constitutional challenge to the decision by the Rules Infraction Board)." *Delvallie*, 2022-Ohio-470, at ¶ 86. An as applied challenge of an infraction received under that Board would have to be raised through a separate writ upon imposition of the infraction. Therefore, any challenges to the vagueness of the enforcement of the Rules Infraction Board must be pursued through a writ of mandamus. *Id.* at ¶ 87.

**{¶63}** Based on the foregoing, we conclude that the provisions in R.C. 2967.271 are not vague.

**{¶64}** The fifth assignment of error is without merit.

**{¶65}** In Abdullah's sixth assignment of error, he argues that the Reagan Tokes Law violates the separation of powers doctrine by giving the executive branch sentencing authority and discretion.

**{¶66}** This argument has been consistently rejected by courts throughout this state. *State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 36; *State v. Hacker*, 2020-Ohio-5048, 161 N.E.3d 112, ¶ 22 (3d Dist.); *State v. Bontrager*, 2022-Ohio-1367, 188 N.E.3d 607, ¶ 44 (4th Dist.); *State v. Ratliff*, 2022-Ohio-1372, 190 N.E.3d 684, ¶ 56 (5th Dist.); *State v. Maddox*, 2022-Ohio-1350, 188 N.E.3d 682, ¶ 7 (6th Dist.); *Delvallie*, 2022-Ohio-470, at ¶ 38.

21

Case No. 2021-L-051

{¶67} Abdullah cites the application of *State ex rel. Bray v. Russell*, 89 Ohio St.3d 132, 729 N.E.2d 359 (2000), in support of the argument that the Reagan Tokes Law violates the separation of powers because it vests judicial power in the executive branch. *Bray* addressed the constitutionality of R.C. 2967.11, which allowed the parole board to punish a rule violation committed by the prisoner by extending the stated prison term. In *Bray*, the Ohio Supreme Court held that R.C. 2967.11 was unconstitutional because the parole board "act[ed] as judge, prosecutor, and jury" and its enactment intruded "well beyond the defined role of the executive branch as set forth in our Constitution." *Id*. at 135.

{¶68} *Bray* is inapplicable to the Reagan Tokes Act. R.C. 2967.11 authorized the parole board to impose an additional prison term beyond the one the trial court imposed. Under Reagan Tokes, the executive branch cannot impose additional time beyond the maximum sentence imposed by the trial court at the time of sentencing. This situation is more similar to that in *Woods v. Telb*, 89 Ohio St.3d 504, 733 N.E.2d 1103 (2000), where the court found Ohio's postrelease control statute, R.C. 2967.27, to be constitutional since the postrelease control terms are made part of the sentence imposed by the court and the parole board's discretionary power to impose postrelease control sanctions did not impinge on the judiciary's mandate to impose sentence. *Id.* at 512. In Reagan Tokes sentences, the court imposes both presumptive minimum and possible maximum prison terms in its sentence. Thereafter, the ODRC determines whether the offender's conduct warrants more than the minimum imposed but cannot exceed the judiciary's maximum imposed sentence. This procedure has been characterized as "not meaningfully distinct from Ohio's current parole system, in which offenders may be kept in prison following

22

service of the minimum term for parole eligibility" and as "similar, if not identical, to the executive branch's authority to release offenders from sentences under Ohio's parole system for indefinite life sentences." *Delvallie*, 2022-Ohio-470, at ¶ 24-25. Therefore, *Bray* does "not compel the conclusion that the Reagan Tokes Law violates the separation of powers doctrine." *Barnes* at ¶ 36.

{¶69} The sixth assignment of error is without merit.

{¶70} In Abdullah's seventh assignment of error, he argues that the Reagan Tokes Law violates his right to a trial by jury since it allows the DRC to engage in fact-finding analysis, which is the role of jurors, citing the vacated opinion in *Delvallie*.

{¶71} In the en banc *Delvallie* opinion, 2022-Ohio-470, the Eighth District found that R.C. 2967.271(C) and (D) do not violate the right to a jury trial. It rejected its prior determination and found that, while *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), prevents the trial court from imposing a sentence in excess of the statutory maximum without the factual circumstances justifying the enhanced sentence first being found by a jury beyond a reasonable doubt, R.C. 2967.271 statutorily requires a court "to impose the minimum and maximum terms upon the offender being found guilty of the qualifying felony offense – similar to an offender being sentenced to life with the possibility of parole under the indefinite life sentencing structure." *Id.* at ¶ 40. Reagan Tokes does not authorize "a sentencing court, or the ODRC for that matter, to impose a sentence beyond the maximum set forth in the sentencing statutes or to elevate the minimum term beyond the ranges set forth in R.C. 2929.14(A)(1)(a) and (A)(2)(a)." *Id.* at ¶ 41. Further, it emphasized that under *Oregon v. Ice*, 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009), a state court's imposition of consecutive sentences did not

23

violate the right to a jury trial because juries historically "played no role in" the decision to impose consecutive or concurrent sentences and that "specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures." *Id.* at ¶ 42, citing *Ice* at 168. Under Reagan Tokes, the court cannot impose a term greater than the maximum as prohibited under *Apprendi* nor does it impose a sentence longer than the minimum term prescribed by statute based on findings of facts in addition to those considered by the jury.

{¶72} The seventh assignment of error is without merit.

{¶73} In his eighth assignment of error, Abdullah argues that Reagan Tokes violates his right to due process. He contends that it violates his right to a fair trial as the statute does not delineate his rights at the hearing and that there is a lack of proper notice of what type of conduct would rebut the presumption of release.

{¶74} As noted above, the rights in the present matter have been compared to those involving parole. The Ohio Supreme Court has held that a right to parole consideration does not create a "liberty interest sufficient to establish a right to procedural due process." *State ex rel. Blake v. Shoemaker*, 4 Ohio St.3d 42, 446 N.E.2d 169 (1983). "However, if state law entitles an inmate to release on parole, that entitlement is a liberty interest that is not to be taken away without due process." *Ratliff*, 2022-Ohio-1372, at ¶ 20.

{¶75} While no Ohio appellate district has held that R.C. 2967.271(C) violates due process, some districts have reached different conclusions regarding whether requiring a prisoner to remain in prison beyond the rebuttable presumption of release is analogous to parole eligibility or parole revocation proceedings involving a termination of liberty

24

which would require an "informal hearing" to verify facts supporting revocation. *Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**{¶76}** The Twelfth and Sixth Districts have concluded that hearings conducted under the Reagan Tokes Law are analogous to parole revocation proceedings. In *State v. Stenson*, 190 N.E.3d 1240, 2022-Ohio-2072 (6th Dist.), the court found that "the Reagan Tokes Law creates a liberty interest more akin to probation revocation decisions," emphasizing that a parole release/eligibility is more discretionary and subjective than parole revocation. *Id.* at ¶ 31. *See also State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 17 ("[t]he hearings conducted by the ODRC under R.C. 2967.271(C) are analogous to parole revocation proceedings, probation revocation proceedings, and postrelease control violation hearings").

**{¶77}** In contrast, the Second District has concluded that "requiring a defendant to remain in prison beyond the presumptive minimum term is akin to the decision to grant or deny parole" since "if [the offender] commits rule infractions or crimes while in prison, he may be required to serve the entire sentence already imposed by the trial court." *State v. Leet*, 2d Dist. Montgomery No. 28670, 2020-Ohio-4592, ¶ 17.

**{¶78}** We find it premature to reach a conclusion as to whether parole revocation or parole eligibility procedures most closely resemble the present matter. Abdullah does not raise a challenge to the statute as applied; since he has not yet been subject to a sentence beyond the minimum term, his challenge necessarily is facial in nature. *See Stenson* at ¶ 31 (the "ODRC has not sought to extend [appellant's] term beyond the presumptive minimum sentence * * * [and his] challenge to the Reagan Tokes Law is necessarily a facial challenge"). "A facial challenge to a statute is the most difficult to

25

bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37. "The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Id.* "If a statute is unconstitutional on its face, the statute may not be enforced under any circumstances." *Wymslo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 21.

**{¶79}** It has been held that "the Reagan Tokes Law may not be found to be unconstitutional, on its face, as violating due process merely because the specific procedures for invoking an additional period of incarceration are not set forth in the Law itself." *State v. Williams,* 6th Dist. Lucas No. L-21-1152, 2022-Ohio-2812, ¶ 22. "[T]he legislature is not required to codify all rules and procedures under the statutory provision but instead can defer to the executive agency's establishment of its own rules or procedures to safeguard constitutional concerns, which must be challenged through the appropriate mechanisms." *Delvallie*, 2022-Ohio-470, at ¶ 59. We do not find that, as a facial challenge, there are no circumstances under which the statute can be enforced. *Stenson* at ¶ 33 ("given that this is a facial challenge to the Law, it cannot be said at this juncture that the Law 'cannot be applied constitutionally in any circumstances'").

**{¶80}** We find that Abdullah's arguments relating to R.C. 2967.271(C) and the procedural safeguards of the hearing to rebut his presumptive release constitute an as applied challenge which is not yet ripe for review, because those aspects of the statute have not been applied to him.

**{¶81}** Further, as to Abdullah's arguments that he does not have notice of the type

26

of inmate behavior that results in rebutting the presumption of release, we disagree. There are various procedures set forth in the Ohio Administrative Code for inmate conduct. The rules for inmate conduct are set forth in Ohio Adm. Code 5120-9-06 and the disciplinary procedures for infractions are provided in Adm. Code 5120-9-08. The procedures for placing an inmate in a restrictive housing assignment are set forth in Ohio Adm. Code. 5120-9-10. These procedures provide notice and an opportunity to be heard and demonstrate under what circumstances a violation may occur which could ultimately be used to rebut the presumption of release. Accordingly, we determine that an inmate is provided with advance notice under the Revised Code and the Ohio Administrative Code of the behavior and conduct that may contribute to or could result in the ODRC rebutting the presumption of release.

{¶82} The eighth assignment of error is without merit.

{¶83} For the foregoing reasons, Abdullah's convictions and sentence for Rape, Felonious Assault, and Kidnapping, in the Lake County Court of Common Pleas, are affirmed. Costs to be taxed against appellant.


THOMAS R. WRIGHT, P.J.,

MARY JANE TRAPP, J.,

concur.

27

Case No. 2021-L-051