[Cite as *Conneaut v. Kelley*, 2025-Ohio-5365.]

# IN THE COURT OF APPEALS OF OHIO
# ELEVENTH APPELLATE DISTRICT
# ASHTABULA COUNTY

CITY OF CONNEAUT,

        Plaintiff-Appellee,

- vs -

CHRISTOPHER KELLEY,

        Defendant-Appellant.

**CASE NOS. 2025-A-0029**
       **2025-A-0031**

Criminal Appeals from the
Conneaut Municipal Court

Trial Court Nos. 2024 CRB 00350 A
        2024 CRB 00350 B

---

## OPINION AND JUDGMENT ENTRY

Decided: December 1, 2025
Judgment: Affirmed

---

*John D. Lewis*, Law Director, City of Conneaut, 294 Main Street, Conneaut, OH 44030 (For Plaintiff-Appellee).

*Andrew S. Lock*, Green Haines Sgambati Co., L.P.A., City Centre One, Suite 800, 100 Federal Plaza East, P.O. Box 849, Youngstown, OH 44503 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Christopher Kelley, appeals the judgments sentencing him on two counts of aggravated menacing following a jury trial. We affirm.

{¶2} In 2024, two complaints were filed in the trial court alleging that Kelley had committed aggravated menacing, a first degree misdemeanor, in violation of Conneaut City Ord. 537.05(a), against two individuals. Kelley pleaded not guilty.

{¶3} The case proceeded to jury trial. After trial, the jury found Kelley guilty on both charges. Thereafter, the trial court sentenced Kelley on each count to a suspended 180-day term of confinement and five years of community control.

{¶4}   Kelley noticed appeals from the sentencing entries. This court sua sponte consolidated the appeals for all purposes.

{¶5}   In his two assigned errors, Kelley argues:

{¶6}   "[1.] There was insufficient evidence to find Appellant guilty of two counts of Aggravated Menacing.

{¶7}   "[2.] Appellant's convictions of Aggravated Menacing were against the manifest weight of the evidence."

{¶8}   The question of whether sufficient evidence supports a conviction "is a test of adequacy," which we review de novo. *State v. Thompkins*, 1997-Ohio-52, ¶ 23. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 2020-Ohio-6670, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶9}   Unlike the standard for the sufficiency of the evidence, the "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence* . . . to support one side of the issue rather than the other.'" (Emphasis in original.) *Thompkins* at ¶ 24, quoting *Black's Law Dictionary* (6th Ed. 1990). When considering challenges to the weight of the evidence, an appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at ¶ 25, quoting *State v. Martin*, 20 Ohio

Case Nos. 2025-A-0029 and 2025-A-0031

App.3d 172, 175 (1st Dist. 1983). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at ¶ 25, quoting *Martin* at 175.

{¶10} Thus, a conclusion that a conviction is supported by the weight of the evidence necessarily includes a determination that the prosecution produced sufficient evidence in support of the conviction. *State v. DiBiase*, 2012-Ohio-6125, ¶ 38 (11th Dist.); *State v. Pesec*, 2007-Ohio-3846, ¶ 44 (11th Dist.).

{¶11} Here, Kelley was convicted of two counts of aggravated menacing, in violation of Conneaut City Ord. 537.05(a), which provides:

> No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family. In addition to any other basis for the other person's belief that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family, the other person's belief may be based on words or conduct of the offender that are directed at or identify a corporation, association or other organization that employs the other person or to which the other person belongs.

*See also* R.C. 2923.01(A) (containing the same provision regarding aggravated menacing). The offense of aggravated menacing does not require the threat be made directly to the intended victim where the circumstances establish that the defendant knew or reasonably should have known that a third party would convey the threat to the intended victim. *State v. Corteggiano*, 2024-Ohio-1653, ¶ 12 (11th Dist.); *State v. Nixon*, 2014-Ohio-4303, ¶ 18 (11th Dist.). A victim's subjective belief that the offender will cause him or his family serious physical harm is an essential element of the offense of aggravated menacing. *State v. McDonald*, 2018-Ohio-3845, ¶ 34 (11th Dist.).

Case Nos. 2025-A-0029 and 2025-A-0031

{¶12} Here, in support of Kelley's assigned errors, he challenges the evidence pertaining to the victims' subjective belief of serious physical harm. We will likewise limit our discussion of the evidence.

{¶13} At trial, the city provided the testimony of the victims ("Terry" and "Shawn"), the testimony of the victims' friend ("Auston"), and the testimony of the responding police officer.

{¶14} The testimony established, as background, that Terry and Shawn are good friends and live together. Terry was also friends with Kelley, whose brother was murdered in 2008. Shawn had served a prison sentence on convictions pertaining to the murder of Kelley's brother.

{¶15} With respect to the incident in the present case, Terry and Shawn testified that, on October 29, 2024, at approximately 9:30 or 10:00 p.m., Terry rode his motorcycle to a Circle K located around the corner from his home. At that time, Shawn was outside the Circle K with Auston. When Terry walked by them, he "fist-bumped" them and told them he was going in the store. Terry also saw Kelley outside the store standing by a garbage can. Terry shook Kelley's hand and then walked in the store.

{¶16} After Terry had obtained some items to purchase, he went to the check-out, and, when he turned around, Kelley was "in [his] face." Kelley told Terry that Shawn "was being disrespectful with him being at the store," and Terry responded that he could not "stop a grown man from going through a store."

{¶17} Kelley replied that Terry and Shawn "could both get a bullet put in [their] head," and Kelley stated that he was "calling people from Jersey," at which point he got out his phone and made a call. During the confrontation in the store, Kelley was pointing

Case Nos. 2025-A-0029 and 2025-A-0031

at Shawn, who witnessed the altercation from outside the building. While Kelley and Terry were inside, Shawn realized that he had forgotten his wallet, and he returned to the house on his bicycle.

{¶18} Following the confrontation, Kelley left the building. Thereafter, Terry left the building, and, as he was pulling away on his motorcycle, he saw Kelley sitting in his car– a black GMC Denali. Kelley followed Terry back to Terry's home, and another vehicle, a silver Chevy Trailblazer, followed directly behind Kelley's car. When Terry pulled into his driveway, the vehicles stopped outside of Terry's house. As Terry was getting off his motorcycle, he informed Shawn, who was walking outside of the garage, of Kelley's threat. A few minutes later, Kelley and the other vehicle left. Terry called the police.

{¶19} During Terry's testimony, the following exchange occurred:

Q. Okay. Did it cause you alarm that the person who just threatened to shoot you was sitting in front of your house in his car?

A. Yes, sir.

Q. Okay.

A. I went inside, and my wife said, call the cops 'cause I want it on statement if I have to lay him down. Because at that point you're messing with my family and my kids and my wife. Me is one thing. My -- my family is a different situation.

Q. Um, so, you arrive home, you see these two vehicles. You know that the Defendant's driving one of the --

A. Yes.

Q. -- the black vehicle, correct?

A. Yes, sir.

Q. Okay. Do you know who was in the other vehicle, the silver Trail Blazer?

Case Nos. 2025-A-0029 and 2025-A-0031

A. No, I don't.

Q. Okay. Fair enough. Um, at some point, then, what happened after you arrived home? You said you went and talked to your wife. Then what happened?

A. She told me to call the cops so if she has to --

Q. And did you, in fact, call the cops?

A. Yes, I did.

Q. Okay.

A. At that point I did.

Q. Okay.

A. Because my -- my wife felt unsafe at that point, and that's unsafe to my kids and me and my wife.

Q. Okay. Let me ask you this. Where was Shawn . . . and Auston . . . when you arrived home? Where were they at?

A. Shawn was coming out of the garage from getting his money, and, ah, Auston was coming back from Circle K. He arrived a couple minutes after I did 'cause he was (unintelligible).

Q. Okay. How long -- if you can estimate this, how long from -- how long -- how much time passed between the confrontation with the Defendant in Circle K until you got home and called the cops?

A. Ten minutes at the most.

Q. [Terry], on October 29th, 2024, did you believe that the Defendant, Christopher Kelley, would cause serious physical harm to you?

A. Yes, sir.

Q. And that was based on the threats that were made at Circle K?

Case Nos. 2025-A-0029 and 2025-A-0031

A. Yes, sir.

Q. And the fact that he pulled up in front of your house afterwards?

A. Yes, sir.

{¶20} On cross-examination, defense counsel asked Terry, "So, clearly, um, when you wanted to document it, you weren't -- you weren't in fear for your life?" Terry responded:

> No. I clearly was in fear for my life. That's why I called an officer. I used to be the type of person that would take stuff in my own hands, and I'm trying to focus on my business and bettering myself, sir. I, myself, wanted it documented, if he come on my property with a weapon and my wife had to put him down with another weapon, I wanted it documented. Clearly, I was afraid for my life.

{¶21} During Shawn's testimony, he maintained that, after Terry returned home, he told Shawn about the threats made at Circle K. Based on those threats and Kelley pulling up outside their house, Shawn believed that there was a "very good chance" that Kelley would cause him serious physical harm. Later in his testimony, Shawn affirmed that he believed Kelley would cause him serious physical harm. Nonetheless, on cross-examination, Shawn maintained that he was "not really" frightened, "but the threat [was] real." On redirect examination, Shawn explained that he was concerned that Kelley would cause him serious physical harm, but he was "not scared of it[.]"

{¶22} Auston's testimony was somewhat inconsistent with the testimony of Terry and Shawn with respect to the details of the evening at issue. However, Auston affirmed that he was outside the Circle K at the time of the altercation between Kelley and Terry, and he could see them speaking with each other, although he could not hear what was being said.

Case Nos. 2025-A-0029 and 2025-A-0031

{¶23} The responding officer testified that he was dispatched to Terry's house for a complaint of threats at approximately 9:30 or 9:45 p.m. on the date at issue. Once he arrived, he obtained statements from Terry and Shawn. The officer authenticated his body camera footage of his discussion with Terry and Shawn, which was admitted at trial as "Exhibit A."

{¶24} In the video, Terry states that he wanted to document the incident in case his wife shot Kelley. Shawn indicates that he would have preferred that Kelley had approached him instead. After discussing the incident, Terry engages the officer in a significant amount of discussion unrelated to the incident at issue.

{¶25} The officer further testified that, a couple of days following the incident, he interviewed a clerk at Circle K, who said she saw the confrontation between Terry and Kelley but did not hear what it was about. The officer also spoke with the manager of the store, who arranged for the officer to review a video of the confrontation. The officer recorded the video on his phone. The recording was admitted at trial as "Exhibit B." In the recording, Terry and Kelley are not entirely in the video frame. Although arguing can be heard between them on the audio of the recording, the words are mostly indiscernible.

{¶26} The defense called the Circle K clerk and manager to testify. Neither had experienced any issues with Kelley, who was a regular customer at the store. Further, the clerk testified that, although she witnessed the argument, she was unable to hear what was being said between Kelley and Terry.

{¶27} Based on the foregoing, Kelley maintains that the evidence does not support the determination that Terry or Shawn believed or feared that Kelley would cause them physical harm. In support, Kelley argues the evidence demonstrated that Terry

Case Nos. 2025-A-0029 and 2025-A-0031

believed *his wife would cause Kelley* serious physical harm. Further, Kelley maintains that the body camera recording shows Terry laughing, joking, and drinking a beverage, and he does not appear "shocked" or "afraid."

{¶28} With respect to Shawn, Kelley argues that Shawn consistently testified that he was not afraid of Kelley, and Shawn's statement to the officer that he wanted Kelley to approach him indicates that he did not believe Kelley would cause him serious physical harm.

{¶29} Although the evidence tends to show that the victims did not "fear" Kelley, fear is not required to demonstrate a subjective *belief* that the offender will cause serious physical harm, albeit fear would seem a common reaction. Both Terry and Shawn testified that they believed Kelley would cause them serious physical harm. The victims' apparent confidence in their abilities to ultimately defend themselves, or their lack of "fear" of harm, are not necessarily inconsistent with the belief that Kelley would cause them serious physical harm. Further, to the extent that the belief of harm and lack of fear of harm may be inconsistent, the jury, as the finder of fact was in the best position to judge the credibility of the victims and resolve inconsistencies in their testimony. *See State v. Abdullah*, 2022-Ohio-3977, ¶ 33 (11th Dist.).

{¶30} We cannot say this is the exceptional case where the evidence weighed heavily against the jury's determination that the victims subjectively feared serious physical harm. Consequently, the convictions are not against the manifest weight of the evidence, and are thus necessarily supported by sufficient evidence, on this element. Therefore, Kelley's assigned errors are without merit.

{¶31} The judgments are affirmed.


ROBERT J. PATTON, P.J.,

SCOTT LYNCH, J.,

concur.

Case Nos. 2025-A-0029 and 2025-A-0031

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgments of the Conneaut Municipal Court are affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
PRESIDING JUDGE ROBERT J. PATTON,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case Nos. 2025-A-0029 and 2025-A-0031