[Cite as *State v. Cooper*, 2022-Ohio-4167.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | Case No. 2021 CA 0024 |
| K'MARR M. COOPER | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:          Criminal Appeal from the Court of Common
                                                      Pleas, Case No.  2020 CR 0096


JUDGMENT:                                   Affirmed


DATE OF JUDGMENT ENTRY:        November 22, 2022


APPEARANCES:

For Plaintiff-Appellee                        For Defendant-Appellant

JASON W. GIVEN                            GEORGE URBAN
PROSECUTING ATTORNEY            116 Cleveland Avenue, NW
BENJAMIN E. HALL                         Suite 808
ASSISTANT PROSECUTOR             Canton, Ohio   44702
318 Chestnut Street
Coshocton, Ohio  43812

*Wise, J.*

**{¶1}** Appellant K'Marr Cooper appeals his conviction and sentence by the Coshocton County Court of Common Pleas. Appellee is State of Ohio. The relevant facts leading to this appeal are as follows.

## STATEMENT OF THE FACTS AND CASE

**{¶2}** On August 21, 2020, Appellant was indicted on one count of Felonious Assault in violation of R.C. §2903.11(A)(1) and (D)(1) and one count of Kidnapping in violation of R.C. §2905.01(A)(3) and (C)(1).

**{¶3}** Appellant was tried by a jury on August 24, 2021.

**{¶4}** At trial, Deputy Landis testified officers were dispatched on July 26, 2020, for a break-in and assault in response to a 9-1-1 call by C.C. at 3:00 a.m. Landis arrived on scene at about 3:30 a.m. Once on scene, Landis said C.C.'s injuries made it difficult to understand her. C.C. was living at the residence with Appellant and four children. One relative of the children was also present.

**{¶5}** Upon arrival, Deputy Landis observed C.C. to be severely injured. She was laying down on a couch on the back porch. Her face was swollen with dried blood on it. C.C. believed there were five children at the house when Deputy Landis arrived, but there were only two located by officers. Landis learned Appellant fled the scene with the other three children. The EMS then transported C.C. via Med-Flight to the trauma center.

**{¶6}** Deputy Landis was then advised that C.C.'s mother had the three missing children. They were dropped off at approximately 4:10 a.m. It is approximately a ten-minute drive from C.C.'s residence to her mother's residence, which left at least thirty minutes unaccounted for when Appellant had the children.

**{¶7}** Next, C.C. testified that she had four children and one relative of the children staying at the residence. In the days leading up to the incident, Appellant and C.C. had been fighting, Appellant was constantly on edge and angry and accused C.C. of infidelity, drug use, and prostitution. Earlier that evening, Appellant, C.C., and the children had dinner at a park. After dinner, they returned to C.C.'s residence. At the residence Appellant told C.C. they need to talk and tried to get her to go to the bedroom. C.C. did not want to go to the bedroom out of fear, and insisted on going outside to smoke. Appellant followed her out. Outside, Appellant threw C.C. to the ground, got on top of her, and shoved a picture on his phone in her face. C.C. denied knowing the man in the picture, so Appellant slapped her in the face and hit her. Appellant told C.C. to go inside to the bedroom so her kids do not find her body outside.

**{¶8}** Appellant then guided her by the arm to the bedroom. Once in the bedroom, Appellant shut the door and slammed her on the bed by her throat. Appellant got on top of C.C. and kept hitting, choking, and slapping her asking her questions about a man she did not know. Appellant threatened to kill C.C. if she got off the bed.

**{¶9}** Appellant allowed her to use the bathroom but insisted the door stay open so he could monitor her. Appellant walked her past the living room where the children were to the bathroom. C.C. could not tell if the children were asleep or awake. C.C. then grabbed a hammer to defend herself, but Appellant sent her flying backward into the kitchen then repeatedly hit her.

**{¶10}** C.C. next remembers waking up in the bed and seeing nothing but red on her hands. C.C. told Appellant to call 911 because she felt like she was dying. She

promised only to say what he wanted her to say. Appellant told her to say someone broke into the house.

**{¶11}** C.C. blacked out again and when she came to, the room was dark and the door was closed. C.C. had to crawl to a different bedroom to use a phone to call 911. She said on the 911 call she did not say what Appellant did because she did not know if he was still in the house or not.

**{¶12}** C.C. testified Captain Bryant was the first officer she spoke with after leaving the scene. At this point, she told Bryant, Appellant had assaulted her. C.C. had a concussion, swelling, and bruising from the assault. She had to undergo speech therapy, physical therapy, and concussion therapy.

**{¶13}** A.K., C.C.'s mother testified she was awakened at 4:01 a.m. by pounding at her door. It was her grandkids who entered her home talking over each other, and no adult was accompanying them. One child said, James King had a gun at C.C.'s home. The children then told her that Appellant had dropped them off.

**{¶14}** When A.K. tried to head to the crime scene, Appellant approached the car and yelled that James King did everything.

**{¶15}** James King testified he has known Appellant for about ten years. On July 24, 2020, Mr. King met Appellant at a park. Appellant accused Mr. King of having a relationship with C.C., and the conversation got heated. After Appellant calmed down, the two parted.

**{¶16}** On the evening of the incident, Appellant texted Mr. King attempting to get him to come over to C.C.'s house. Mr. King refused. The texts continued until 2:00 a.m. on July 26, 2020. Mr. King then denied having any type of relationship with C.C.

{¶17} In July of 2021, Mr. King received a letter from Appellant apologizing for blaming Mr. King for the attack. In the letter Appellant admitted to striking C.C.

{¶18} Captain Bryant then testified he arrived at the residence at 4:00 a.m. He entered the residence, and photographed the scene. He observed a table covered in Chinese food in front of the doorway to the basement. There was significant blood in C.C.'s bed on the sheets, bedspread, mattress, and pillows. He noted blood between the kitchen and living room. The physical evidence corroborated C.C.'s statement of events.

{¶19} Appellant was arrested the following day, July 27, 2020. He claimed someone else came through the basement, which was blocked by the table and Chinese food, and then assaulted C.C. Appellant then changed his story saying it was self-defense. Appellant eventually admitted to Captain Bryant he punched C.C. and choked her out because he thought she was cheating on him. Appellant also said Mr. King was waiting at the house to kill him, and "that he could feel it in his spirit." Appellant admitted to driving around with the children while C.C. was on the floor bleeding. Appellant's story kept changing from Mr. King did this, to an unidentified black male did this, to self-defense, to C.C. was in on a conspiracy to harm Appellant.

{¶20} Finally, N.C., one of the children, testified that Appellant shoved C.C. into the garage, then N.C. heard banging and shouting in C.C.'s bedroom.

{¶21} Appellant was found guilty of Counts 1 and 2.

{¶22} Appellant was sentenced to a term of seven to ten and a half years for Felonious Assault and ten to fifteen years for Kidnapping to be served consecutively.

**ASSIGNMENT OF ERROR**

{¶23}  Appellant filed a timely notice of appeal. He herein raises the following three Assignments of Error:

{¶24}  "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST THE APPELLANT AND THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THEREBY VIOLATED [sic] APPELLANT'S GUARANTEES OF DUE PROCESS PURSUANT TO THE FOURTEENTH AMENDMENT OF THE US CONSTITUTION AND ARTICLE ONE, SECTION TEN OF THE OHIO CONSTITUTION, AND THE CONVICTION MUST BE REVERSED.

{¶25}  "II. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶26}  "III. THE APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE U.S. AND OHIO STATE CONSTITUTIONS WAS VIOLATED WHEN THE TRIAL COURT IMPOSED AN INDEFINITE SENTENCE PURSUANT TO THE REGAN TOKES ACT, THAT DOES NOT ALLOW FOR JUDICIAL DECISION MAKING AT THE TIME OF THE SENTENCE AND AT TIMES IN THE FUTURE."

**I.**

**{¶27}** In Appellant's first Assignment of Error, Appellant argues his conviction is against the manifest weight of the evidence and is not supported by sufficient evidence. We disagree.

**{¶28}** Sufficiency of the evidence and manifest weight of the evidence are separate and distinct legal standards. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. Essentially, sufficiency is a test of adequacy. *Id.* A sufficiency of the evidence standard requires the appellate court to examine the evidence admitted at trial, in the light most favorable to the prosecution, to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259.

**{¶29}** In contrast to the sufficiency of the evidence analysis, when reviewing a weight of the evidence argument, the appellate court reviews the entire record, weighing the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts of evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387.

**{¶30}** R.C. §2903.11, in pertinent part, states:

> (A) No person shall knowingly do either of the following:
>
> (1) Cause serious physical harm to another[.]
>
> …

(D)(1)(a) Whoever violates this section is guilty of felonious assault. Except as otherwise provided in this division or division (D)(1)(b) of this section, felonious assault is a felony of the second degree.

**{¶31}** R.C. §2905.01, in pertinent part states:

(A)      No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

(3) To terrorize, or to inflict serious physical harm on the victim or another[.]

(C)(1) Whoever violates this section is guilty of kidnapping. Expect as otherwise provided in this division or division (C)(2) or (3) of this section, kidnapping is a felony of the first degree.

**{¶32}** At trial, the victim testified Appellant threw her to the ground outside, grabbed her by the arm, and then escorted her to her bedroom. In the bedroom Appellant closed the door, slammed the victim to the bed by her throat, climbed on top of her and choked, slapped and hit her repeatedly. He allowed her to use the restroom supervised, then continued his abuse. Captain Bryant testified that the physical evidence found at C.C.'s residence corroborated her version of events.

**{¶33}** Appellant argues that eye witness testimony and photographs corroborating the event are insufficient as a matter of law to sustain the conviction. However, it is well established that the weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002-Ohio-2126, 767 N.E.2d 216. The jury as the trier of fact was free to accept or reject any and all

of the evidence offered by the parties and assess the witness's credibility. *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996).

**{¶34}** We find the State presented sufficient evidence, if believed by a jury, that Appellant caused serious harm to the victim and by force and threat of force restrained the victim's liberty. Our review of the entire record fails to persuade us that the jury lost its way and created a manifest miscarriage of justice. Appellant was not convicted against the manifest weight of the evidence.

**{¶35}** Appellant's first Assignment of Error is overruled.

## II.

**{¶36}** In Appellant's second Assignment of Error, Appellant argues trial counsel was ineffective for failing to properly object to or request a limiting instruction regarding 911 calls, did not cross-examine Mr. King and A.K., and failed to ask for a presentence investigation, and presented no mitigating testimony at sentencing. We disagree.

**{¶37}** Our standard is set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Ohio adopted this standard in the case of *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. *Id.* First, we must determine whether counsel's assistance was ineffective; whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his essential duties to the client. *Id.* If we find ineffective assistance of counsel, we must then determine whether the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. *Id.* This requires a showing

there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the trial would have been different. *Id.*

**{¶38}** Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267 (1998). In addition, the United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Bradley* at 43, 538 N.E.2d 373, quoting *Strickland* at 697, 104 S.Ct. 2052. Even debatable trial tactics and strategies do not constitute ineffective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

**{¶39}** First, Appellant argues Appellant's trial counsel should have objected to the introduction of the 911 calls into evidence, or ask for a jury limiting instruction. Appellant makes no citation to legal authority as to the basis of the objection, why it should be excluded, or what type of limiting instruction should have been given failing to show Appellant's trial counsel's performance with regards to the 911 calls fell below an objective standard.

**{¶40}** Next, Appellant argues trial counsel failed to cross-examine witnesses James King and A.K. However, Appellant fails to show any relevant information A.K. and James King had which would have been disclosed by a cross-examination. Furthermore, "trial counsel's decision to cross-examine a witness and the extent of such cross-examination are tactical matters." *State v. Diaz*, 9th Dist. No. 04CA008573, 2005-Ohio-3108, ¶26, citing *State v. Flors* (1987), 38 Ohio App.3d 133, 139, 528 N.E.2d 950. "As

such, decisions regarding cross-examination are within trial counsel's discretion, and cannot form the basis for a claim of ineffective assistance of counsel." *Id.*

{¶41} Next, Appellant argues trial counsel failed to request a presentence investigation report. This is factually inaccurate. Appellant did request a presentence investigation report.

{¶42} Finally, Appellant argues trial counsel should have presented any mitigating testimony from Appellant or other witnesses. However, Appellant failed to identify if Appellant or any other witness had testimony to offer which could mitigate his sentence.

{¶43} Appellant has failed to show the trial counsel's performance fell below an objective standard of reasonable representation.

{¶44} Appellant's second Assignment of Error is overruled.

**III.**

{¶45} In Appellant's third Assignment of Error, Appellant challenges the constitutionality of the Reagan Tokes Act, specifically R.C. §2967.271, which codified hybrid indefinite prison terms for first- and second-degree felonies. Appellant argues that the Act violates the separation of powers doctrine, the constitutional right to trial by jury, and due process. We disagree.

{¶46} This Court has previously found this type of challenge to not yet be ripe for review. *State v. Downard*, 5th Dist. Muskingum, CT2019, 2020-Ohio-4227, *appeal allowed*, 160 Ohio St.3d 1507, 2020-Ohio-6835, 159 N.E.3d 1152. However, the Ohio Supreme Court found that the issue of the constitutionality of an indeterminate sentence imposed under R.C. §2967.271 ripens at the time of sentencing, and that the law may be challenged on direct appeal. *State v. Maddox*, 2022-Ohio-764, ¶21.

**{¶47}** Recently, in *State v. Burris*, 5ᵗʰ Dist. Guernsey No. 21CA000021, 2022-Ohio-1481, and *State v. Ratliff*, 5ᵗʰ Dist. Guernsey No. 21CA000016, 2022-Ohio-1372, this Court set forth analysis regarding Appellant's arguments.

### Violation of Right to Trial by Jury

**{¶48}** Appellant argues that the Department of Rehabilitation and Correction ("DRC") unilaterally conducts fact finding which may extend an inmate's sentence, and that this violates Appellant's right to trial by jury citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We disagree.

**{¶49}** In *Apprendi*, a jury convicted the defendant of a gun crime that carried a maximum prison sentence of 10 years. *Id.* However, a judge imposed a longer sentence pursuant to a statute providing him authorization. *Id.* The judge found, by a preponderance of the evidence, that the defendant had committed the crime with racial bias. *Apprendi* held this scheme unconstitutional. *Id.* "[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum," the Court explained, "must be submitted to a jury, and proved beyond a reasonable doubt" or admitted by the defendant. 530 U. S. at 490, 120 S.Ct. 2348. A State may not avoid this restraint on judicial power by simply calling the process of finding new facts and imposing a new punishment a judicial "sentencing enhancement." *Id.*, at 495, 120 S.Ct. 2348. "[T]he relevant inquiry is one not of form, but of effect—does the required [judicial] finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.*, at 494, 120 S.Ct. 2348.

**{¶50}** In *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), the United States Supreme Court addressed mandatory minimum sentences and

the Sixth Amendment. In *Alleyne*, the jury relied on victim testimony of an armed robbery that one of the perpetrators possessed a gun. The trial court relied on the same testimony to determine that either Alleyne or his accomplice brandished a gun. The testimony was the same, but the findings were different. The jury found that Alleyne possessed a gun, but made no finding with regard to whether Alleyne brandished a gun. The court, however determined that the gun was brandished. The Supreme Court reviewed the statutory punishment structure, which included a mandatory minimum sentence of five years if a crime of violence was committed while the offender carried a firearm, seven years if the firearm was brandished, and ten years if the firearm was discharged during the crime. 18 U.S.C. 924(c)(1)(A). The crime was otherwise punishable by a term of imprisonment not exceeding 20 years. 18 U.S.C.1951 (a). The Court held that where facts were not found by a jury that enhanced the mandatory minimum penalty for a crime, the Sixth Amendment was violated. Specifically, "[b]ecause mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne* at 103. *See, State v. Fort*, 8th Dist. Cuyahoga No. 100346, 17 N.E.3d 1172, 2014-Ohio-3412, ¶29. However, the majority in *Alleyne* was held:

> In holding that facts that increase mandatory minimum sentences must be submitted to the jury, we take care to note what our holding does not entail. Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment. *See, e.g., Dillon v. United States*, 560 U.S.

817, ——, 130 S.Ct. 2683, 2692, 177 L.Ed.2d 271 (2010) ("[W]ithin established limits [,] ... the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts" (emphasis deleted and internal quotation marks omitted)); *Apprendi*, 530 U.S. at 481, 120 S.Ct. 2348 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute").

*Alleyne*, 570 U.S. at 116. *See also, State v. Salim*, 5th Dist. Guernsey No. 13 CA 28, 2014-Ohio-357, ¶19.

**{¶51}** Under the Reagan Tokes Act the judge imposes both a minimum and a maximum sentence. No judicial fact finding is required. In Ohio, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. The Reagan Tokes Act does not permit the Department of Rehabilitation and Correction ("DRC") to extend a sentence beyond the maximum sentence imposed by the trial court. *Burris* at ¶86. "Further, the facts which postpone an inmate's release date are facts found as a result of prison disciplinary proceedings, not the underlying crime." *Id.*

### Violation of Separate Powers

**{¶52}** "The Ohio Supreme Court has made it clear that when the power to sanction is delegated to the executive branch, a separation-of-powers problem is avoided if the

sanction is originally imposed by a court and included in its sentence." *Burris* at ¶78, citing *Hernandez v. Kelly*, 108 Ohio St.3d 395, 2006-Ohio-126, 844 N.E.2d 301, ¶18-20 citing *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶19. This is the scheme established by the Reagan Tokes Law. *State v. Ferguson*, 2nd Dist. Montgomery No. 28644, 2020-Ohio-4153, ¶23. The statute does not permit DRC to act outside of the maximum prison term imposed by the court. *Id.* Accordingly, the Reagan Tokes Act does not violate the separation of powers doctrine.

### Violation of Due Process

{¶53} Procedural requirements are minimal in the context of parole. *Burris* at ¶59. "[P]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (citations omitted). Courts have found the following procedures should be accorded to prisoners in a disciplinary proceeding:

> 1). a prisoner is entitled to a review unaffected by "arbitrary" decision making. *Wolff*, 418 U.S. at 557-558, 94 S.Ct. 2963; (*See*, Ohio Admin. Code 5120-9-08). 2). Advance written notice of the claimed violation. *Wolff*, 418 U.S. at 563, 94 S.Ct. 2963. (*See*, Ohio Adm. Code 5120:1-8-12). 3). A written statement of the fact finders as to the evidence relied upon and the reasons for the disciplinary action taken. *Wolff*, 418 U.S. at 563, 94 S.Ct. 2963. (*See*, Ohio Adm. Code 5120-9-08(M); Ohio Adm. Code 5120: 1-11(G)(1)). 4). Prison official must have necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may

create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963 (*See*, Ohio Adm. Code 5120-0-08(E) (3); Ohio Adm. Code 5120-9-08(F)). 5). "Where an illiterate inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Wolff*, 418 U.S. at 570, 94 S.Ct. 2963. (*See*, Ohio Adm. Code 5120-9-07(H)(1)).

*Burris* at ¶55

**{¶54}** In the case *sub judice*, the DRC must conduct a hearing to rebut the presumptive release date. *Id.* at ¶66. According to R.C. §2967.271(C) the DRC must determine the applicability of the following factors:

(1)     Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:

(a)     During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated.

(b)      The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender continues to pose a threat to society.

(2)      Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

(3)      At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

**{¶55}** The Reagan Tokes Act requires DRC to provide notice of the hearing. R.C. §2967.271(E). The Ohio Administrative code sets forth inmate rules of conduct, disciplinary procedures for violations of the rules, under what circumstances an inmate is transferred to restrictive housing, and procedure for release consideration hearings. Ohio Adm. Code 5120-9-06; Ohio Adm. Code 5120-9-08; Ohio Adm. Code 5120-9-10; Ohio Adm. Code 5120: 1-1-11. Therefore, the DRC gives the inmate notice in advance of behavior which may contribute or result to extending their sentence.

**{¶56}** The Reagan Tokes Act provides the inmate an opportunity to be heard. The DRC "shall provide notices of hearings to be conducted under division (C) or (D) of this section in the same manner, and to the same persons, as specified in section 2967.12 and Chapter 2930 of the Revised Code with respect to hearings to be conducted regarding the possible release on parole of an inmate." R.C. §2967.271(E).

**{¶57}** Therefore, we find the Reagan Tokes Act does not violate Appellant's right to due process.

**{¶58}** Appellant's third Assignment of Error is overruled.

**{¶59}** For the foregoing reasons, the judgment of the Court of Common Pleas of Coshocton County, Ohio, is hereby affirmed.

By: Wise, J.

Hoffman, P. J., and

Baldwin, J., concur.

JWW/br 1118